ANSON HULL, 2d. *vs.* AUSTIN FULLER.

Where the particulars, in the description of land in a deed, are inconsistent and incongruous, the court may reject a part and give effect to the deed. In doing this, they will be guided by the intent of the parties, as gathered from the deed.

Although a mortgagee, sueing in ejectment, must prove his debt, in order to recover; yet a mortgagee in possession, who sues a stranger in trespass or case for a nuisance, need not show his note or bond secured by the mortgage.

In such action, the grantor of the plaintiff is a competent witness for him, unless the title is put in issue by the pleadings.

A party, taking possession of a part of the land conveyed by his deed, is in legal construction in possession of all the land described. But it is necessary that the deed give a definite and certain extent to the land, otherwise he will be deemed in possession only to the extent of his actual possession.

Where commissioners, appointed by the legislature, to re-survey and complete an allotment of a town, alter some of the original lines, and the parties in possession subsequently convey agreeably to the corrected lines, this *is* sufficient evidence of an acquiescence, and will bind the parties and their grantees.

This cause came from the court below upon the following bill of exceptions.

This was an action on the case for flowing certain lands in Enosburgh, alleged to be the property of the plaintiff, to wit, part of lot No. 216, by means of a dam of the defendant, erected on his own premises. Plea, not guilty.

On trial, the plaintiff offered in support of the issue on his part,

1. A deed from Eliphalet Dickinson to himself, dated June 2, 1823, conveying to him lot No. 216 in Enosburgh, and also a deed from Hare and Lee of the premises to Stephen House, dated Nov. 9, 1809, (which deed was a deed of mortgage,) and an assignment from House to Dickenson, 28 March, 1810.

2. Evidence tending to show, that previous to the flowing of the land complained of, viz. in the year 1823, or spring of 1824, the plaintiff was in possession of said lot, No. 216, and had remained in possession thereof ever since; that in the spring or summer of 1824, and while the plaintiff was in possession, the defendant, being in possession of lot No. 21, adjoining to said lot 216, erected a dam on said lot 21, across a certain stream which flowed over or across both said lots, by means whereof the plaintiff's lot was overflowed, to the great injury of the land. And among other witnesses, the plaintiff offered said S. House as a witness to prove his possession, who was objected to by the defendant as interested by reason of his conveyance to said Dickinson, the plaintiff's grantor; but the objection was overruled by the court and the witness admitted.

FRANKLIN,
January,
1835.

Hull.
vs.
Fuller.

The plaintiff having rested his case, the defendant, in order to show a right in himself to maintain the dam in question, offered in evidence—

1. Testimony tending to prove, that, as early as the year 1798, one Fasset and said S. House were jointly in possession of the land in question, viz. lot No. 21, holding as tenants in common.

2. Sundry deeds, viz : a deed from said Fasset to Abiathar Waldo, dated March 11, 1805—a deed from said A. Waldo to Gursham Waldo, dated Sept. 19, 1818.

3. An act of the legislature of this state, passed Oct. 29, 1810, appointing commissioners to complete the division of the town of Enosburgh, &c. together with the record or return made by said commissioners of their doings.

4. A deed from Gursham Waldo to Daniel Chilson of seventy acres of lot No 21, dated Oct. 14, 1819—a deed from Daniel Chilson to the defendant of the same land, dated June 13, 1822— and a deed from Gursham Waldo to the defendant, dated July 2, A. D. 1824.

5. The defendant further offered evidence tending to prove, that by the original allotment made in 1796 of Enosburgh, lot No. 21 was run out and divided from lot No. 20 in said town by a meridian line, both lots being parallelograms, and lying, No. 20 on the east and No. 21 on the west :—that when the commissioners came to act under the act of the legislature, passed in Oct. 1810, they re-surveyed the lots as far as the east line of lot No. 21, and that No. 21 was re-surveyed. He also proved by the surveyor who run out lot No. 21, under the commissioners, that he began at the north-west corner, and running east one hundred and sixty rods, made his corner and turned first south and then west, laying out No. 21 in a different shape from that in which it was originally laid, adding five acres at the south-east corner for a mill-site;—that he then supposed that the measure (one hundred and sixty rods) would bring him to the original line run in 1796, by him, and as far as the line between No. 20 and 21, but that, upon running the line in 1824, he discovered that lot No. 21 was originally laid out one hundred and seventy six rods in length, instead of one hundred and sixty rods, and that the east line of No. 21, as laid out by the commissioners, was sixteen rods west of his line run in 1796. And the defendant further offered evidence tending to show that the land flowed was originally a part of lot No. 21.

6. It also appeared that lot No. 216 was not laid in the original allotment of said town, but was a *pitch,* made subsequent to the

original allotment, at some time previous to the act of 1810, which was sanctioned by said commissioners and acquiesced in by the proprietors, and had been occupied accordingly; and that it was an irregular lot, comprising a part of original lot No. 20, a part of original lot No. 21, and part of other lots; and that the boundaries of No. 216 were made and marked by visible monuments, without reference to original lines.

7. The defendant also offered evidence tending to prove that he took possession of lot No. 21, under his deed from Chilson, as early as the year 1822, and has continued in possession to the present time. The defendant also offered to prove by said Chilson, that as early as the year 1810, he was in possession of lot No. 21, under said Waldo, with a view to give a further or greater extent to lot No. 21, than that fixed by the commissioners' survey in 1812; but the court decided, that no possession of Chilson previous to that survey would avail the defendant, unless it was followed by an actual possession afterwards of the land in question, by the defendant or his grantors, but the defendant would be restricted to the limits of No. 21, as surveyed by the commissioners, unless he proved an actual possession since of lands lying out of those limits. The defendant was also permitted to give evidence that he or his grantors had flowed the land in question, either wholly or in part, at any time previous to the plaintiff's possession of lot No. 216.

The defendant objected, that no constructive possession could be derived to the plaintiff through his deed from Dickinson, inasmuch as the last boundary on the description was on the east or right bank of the branch, and that therefore no line could be run from that to the first boundary on the west bank of the same. But the court decided, and so instructed the jury, that when there is an incongruity or inconsistency in the description in a deed, a part may be rejected, if a sufficient description remain;—that if a part be impossible, it may be rejected, and if the description be inconsistent, that part should be rejected which goes to defeat the intention of the parties, as apparent on the face of the deed, or that part which would defeat the deed altogether—and that part adopted which gives effect to the deed;—that in this instance, the impossibility of running the line on the west side of the branch would not render the deed void, but that the line should be run from one point to the other, conforming as near as possible to the words of the deed, but rejecting the expression, "on the west side," &c. where it became indispensable;—and that, in the opinion of the

FRANKLIN
January,
1835.

Hull
vs.
Fuller.

court, the line should run from the last monument to the west or left bank, near the bend as laid down in the plan, and thence on the west side of the boundary first mentioned;—and that the plaintiff, if in possession of any part of lot No. 216, under his deed, would be constructively in possession of the whole, unless a part of lot No. 216 was covered by the commissioners' survey of lot No. 21.

The court also charged the jury, that the defendant did not acquire a right, by virtue of any of the deeds offered by him, to flow any land other than what was contained in lot No. 21, as surveyed by the commissioners;—that the original line between No. 20 and 21, as run in 1796, was immaterial, provided the limits of No. 21 were designated by the commissioners by any visible monuments;—that the deed from Chilson to defendant limited him to lot No. 21, and that it therefore became unnecessary to inquire what rights Waldo might have had originally, inasmuch as he had restricted his deed to Chilson to No. 21;—and further, that the deed from Waldo to the defendant did not convey to the defendant any further or greater right than he possessed before, inasmuch as it appeared on the face of the deeds that Waldo, Chilson, and defendant had acquiesced in the doings of the commissioners, and indeed held under them;—that they were to be regarded as having sanctioned the proceedings of the commissioners in ascertaining and settling the uncertain boundaries of their land, and as having waived any uncertain or indefinite claim which Waldo might have previously had;—that Waldo must be presumed to have parted with all his title by his deed to Chilson in 1819, and that, of course, he had no further interest to be conveyed to the defendant by his deed of July 2, 1824.

The court further charged the jury, that the plaintiff could not recover, unless he had proved that the land flowed was a part of lot No. 216. Nor could the plaintiff recover, if the land flowed was a part of No. 21, as surveyed by commissioners, whether a part of No. 216 or not.

They further charged the jury, that the right to flow the land in question might be appurtenant to lot No. 21, and that if the defendant or his grantors had actually flowed the land in question to any extent before the plaintiff took possession, they had a right to flow it to the same extent afterwards;—that, therefore, if the defendant had flowed the land before, to the full extent of the flowing since, the plaintiff could not legally recover. But if the defendant had flowed the land since the plaintiff took possession to a greater extent than it was flowed before, the plaintiff would be entitled to receive for the injury sustained by the excess.

FRANKLIN,
January,
1835.
────────
Hull.
vs.
Fuller.

The defendant also offered the testimony of a surveyor, stating that, in the year 1809 he run out the lot No. 216 for said House, and that he run the same according to the description of the plaintiff's deed from E. Dickinson, except that he did not run the last line, to wit, from the last monument in the description to the one started from, (the hemlock stump;) that he was directed by House to stop at the end of the "twenty-eight rods," as he wished to leave a sufficient space for a mill-pond. And the defendant, in connexion with this, offered to prove that the termination of the "twenty-eight rods" was at the edge of the pond as raised by defendant's dam. This evidence was objected to by the plaintiff, and rejected by the court.

The defendant also offered a plan of said town, proved to have been made from the surveys of the commissioners in 1812, to prove that the east line of No. 21 was further east than the line run by the commissioners as the east line, which plan was admitted and may be referred to as a part of this case. But the court instructed the jury, that if the commissioners, by their survey, fixed the east line of No. 21 further west than the line run in 1796, between 20 and 21, that the *actual* line of the commissioners would govern, and must be taken to be *the* line between these parties, and not the old line of 1796.

To the several decisions above mentioned and the charge aforesaid, the defendant excepted. Exceptions allowed and certified.

*J. Smith for defendant.*
*Hunt and Beardsley and Smalley and Adams for plaintiff.*

The opinion of the court was delivered by

PHELPS, J.—The first point, in the natural order of this case, arises out of the proof offered by the plaintiff of his title to the land in question. It is objected, that the deed from Dickinson to him is void for want of a sufficient description. There is an inconsistency in the description of the land conveyed, in this particular: the first boundary given, or the starting point, is on the south or west bank of the stream, on which the defendant's mills are located. After giving several courses and distances, the line is brought to a point on the north or right side of the stream, and then follows this expression, "*thence, on the south side of the branch, to the bounds first mentioned.*" The two *termini* of this last line being on opposite sides of the stream, this part of the description becomes impossible; so far, at least, as this, the line can-

not lie "*upon the South side of the branch.*" This inconsistency,
it is argued, vitiates the deed.  Upon reference to the deed, it is
found, that this difficulty does not appear upon its face, but is dis-
covered by tracing the courses and distances upon the land.  The
description in the deed is well enough, but the difficulty occurs in
its application.  It is not, therefore, *ambiguitas patens*, but a la-
tent ambiguity, which may well be cured by extraneous proof.  It
is the common case, of a want of perfect correspondence, in the
several particulars given in the deed, by way of description.—
Nothing is more common than to find, upon applying the descrip-
tion in a deed to the several localities referred to, that course or
distance, or the precise relative location of visible objects has been
mistaken.  It never was supposed that a deed is void for such in-
accuracies.  But the difficulty being latent, the intent of the par-
ties may be ascertained by extraneous proof.  The rule which al-
lows resort to such proof, of itself implies the validity of the in-
strument.

The expression 'on the south side of the branch,' is not neces-
sary to a perfect description of the land.  It is a mere redundan-
cy, and if it be rejected the description is not only perfect but con-
sistent throughout.  There is no doubt that we are authorized to
reject the expression.  It is a general rule, that where the intent
of the parties is satisfactorily ascertained, and their contract can be
carried into effect, agreeably to that intention, incongruities and
inconsistencies are to be reconciled ; and such parts, as through mis-
apprehension tend to defeat that intent, are to be discarded.  More
especially, where in a deed of conveyance, the land intended to be
conveyed is clearly ascertained, is a redundancy or over-particularity
of description to be disregarded.  So too, when an inaccuracy occurs
in any particular, added for greater certainty, but found to be mis-
apprehended by the parties, it is the duty of courts to correct the
mistake, and to see that a misapprehension in a point not essential,
shall not vitiate the contract or defeat its manifest purpose.  *Mos-
sie* vs. *Watts*, 6 Cranch 148.—*Ship* vs. *Miller* 2 Wheat. 316.—
*Newsom* vs. *Pryor* 7 do. 7.

In determining which of two inconsistent requirements of a deed
shall be rejected, the proper criterion is the intent of the parties,
as gathered from the deed itself.  That part is to be rejected which
tends to defeat the intention of the parties, or to defeat the deed,
and that part adopted which consists with the one and sustains the
other.  At the same time every part of a description is to be re-
garded, as far as may be, and is to be rejected only when indis-

14

FRANKLIN,
January,
1835.

Hull.
vs.
Fuller.

pensable. Hence the expression, 'on the south side of the branch,' is to be conformed to, as nearly as the localities will permit. Upon inspection of the plan, it is apparent, that the last course, if run agreeably to the direction of the jury, will be very near a straight line, and will, at the same time, pass, for most of its length, on the south side of the branch. The direction to the jury on this point we think correct.

It is next objected, that the plaintiff's title being that of a mortgagee, the note secured by the mortgage should have been produced. The rule requiring the production of the note, does not apply to the case of a mortgagee in possession. Much less would it apply in this case, where possession alone is sufficient to sustain the action, and the defendant is a stranger to the mortgagor's title.

The objection to the competency of House, the grantor of the plaintiff, is clearly unfounded. Whatever may be the issue of this suit, neither the verdict nor judgment could be evidence in any suit between the plaintiff and the witness, in relation to the title; because it concludes nothing. To make the verdict or judgment evidence between them, the title must be put in issue by the pleadings.

The important question in the case, however, arises upon the evidence offered by the defendant, and the decision of the court below thereon.

It is insisted, that by virtue of some or all of the deeds offered by the defendant, or by the possession of his grantors under them, or both, the defendant had acquired a title to the land flowed, or at least such a possessory right as justifies the flowing.

And here it is to be borne in mind, that the jury were distinctly charged, that the plaintiff could not recover for flowing any part of lot No. 21, but that, to entitle himself to a verdict, he must prove an injury done to lot No. 216. And further, that he could not recover for flowing any part of lot No. 21, as surveyed by the commissioners, whether it were included in the lines of 216 or not.

And it should also be remembered, that neither of these parties proved any title in their respective grantors, except so far as a title may have been derived from possession under their deeds.

The defendant first attempts to derive a title from Fasset, through the Waldo's and Chilson; but his deed from Chilson conveys only lot No. 21, as run by the commissioners. The court gave to the deed all the effect which the defendant could desire, and the jury have found that the flowing complained of was not upon that lot.

FRANKLIN,
January,
1835.
Hull.
vs.
Fuller.

He then resorts to his deed from G. Waldo, dated in 1824, and contends, that although the deeds from G. Waldo to Chilson, and from Chilson to himself, convey only lot No. 21, yet that G. Waldo had acquired by his deed from A. Waldo a more extensive right, and that what was not conveyed to Chilson remained in Waldo until he conveyed to the defendant in 1824.

To say nothing of the effect of the plaintiff's adverse possession of the land, at the date of this deed, we will proceed to inquire what rights remained in G. W., after his conveyance to Chilson.

And in the first place, I repeat, there was no evidence of any title in A. Waldo, or Fasset, his grantor, to any thing more than lot No. 21. The case states, that Fasset, as early as 1798, was in possession of lot No. 21. And what did he convey to A. Waldo? Simply a part of lot No. 21;—unless indeed the following part of the description, viz: " *thence continuing to run in such direction as to include a mill yard, and the whole of a mill pond, which may be raised by a dam on said falls, to a road*," &c. is understood to include other land. If it be so understood, the question may be asked, whence did Fasset derive his title to that other land?

It is argued, however, that although no title is shown in Fasset, or possession in fact, of any thing more than No. 21, yet this deed would give a definite extent to Waldo's possession; and that, if he had possession in fact of any portion of the land described by this deed, he was constructively in possession of all. That such would be the effect, so far as the land was actually covered by the pond, is readily conceded; and so far the defendant had the full benefit of his doctrine; for the jury were told, that so far as the defendant or his grantors had flowed the land, before the plaintiff took possession of it, so far he had the right to flow it afterwards. To hold, however, that this vague description would give a right to flow the land, to an indefinite extent, at any future period, would be carrying the doctrine of constructive possession too far. This doctrine goes upon the ground, that a deed recorded gives to a possession a definite limit and extent. This description is altogether vague and indefinite. Besides, no action could be maintained against Waldo upon the ground that his neighbor's land was exposed to injury under this grant; and as no action could be sustained by the owner, under such circumstances, so no right would be acquired against him. It is apparent then, that neither A. Waldo, nor his grantee, G. Waldo, whose deed contains a similar description, could derive any right under that clause, further than

FRANKLIN,
January,
1835.
───────
Hull.
vs.
Fuller.

they had actually occupied the land, by flowing it.    Gershom Waldo had therefore nothing remaining in him, after his conveyance to Chilson, which would pass to the defendant by the deed of 1824, unless indeed it be a possessory right to land actually flowed, the right to which was conceded to the defendant, by the charge to the jury.

It is further insisted, that the court erred in the view which they took of the question, as to the east line of No. 21.

Admitting, for the present, that the early deeds gave a constructive possession as far east as the original line of that lot, which is by no means apparent on the face of the deed, yet a review of the history of the case will furnish a ready answer to all claim of right derived from that source.    The deed from Fasset to Waldo is dated in 1805—that from A. Waldo to G. Waldo in 1818.    No title is shown in Fasset, nor does the case show any possession in fact under these deeds, until Chilson took possession under the Waldo's in 1810.    In 1812, the commissioners appointed to re-survey the town, and settle the boundaries of the several lots, completed their doings, and it is admitted, that they in fact altered the east line of 21, to give room for the plaintiff's lot, which was originally a pitched lot.    The question as to the contested lines then arose for the first time.    Whether the doings of these commissioners were of sufficient authority to divest the title, if any had been previously acquired, it is not necessary to decide.    When Chilson, who it seems took possession under a contract to purchase, took his conveyance, he was limited to lot No. 21, *as run by the commissioners.*    Whatever then might have been his previous claims, they were limited and defined by that deed, which, being recorded, was notice to all the world, to the plaintiff as well as others, that he claimed only the lot, as the commissioners had made it.    He could have no constructive possession of any thing more thereafter, and any previous claim to any greater extent was *ipso facto* abandoned by the acceptance and recording of that deed.    It is very clear, that his constructive possession could not transcend the limits specified in his deed; and, although an actual possession afterwards might have extended his claims, yet no actual possession up to the original line, subsequent to the return of the commissioners, was proved, or attempted to be proved.

The testimony of Chilson, on this head, was altogether inadmissible.    It is clear, that no previous possession would affect the question, as to his acquiescence in the doings of the commissioners, and that nothing short of an actual possession afterwards, to

FRANKLIN
January
1835.

Hull
vs.
Fuller.

the original line, would counteract the effect of the deed. That effect, as to any legal or constructive possession, was a question of law, and not a proper subject of parol proof.

The deeds from Waldo to Chilson, and from Chilson to the defendant, show an acquiescence, by all parties, in the decision of the commissioners.

It is however argued, that the expression, "as run by commissioners," does not apply to No. 21, but to lot Nò. 206, a part of which is conveyed by the same deeds. The description in the deeds is, "seventy acres of lot No. 21, belonging to the right of S. Avery, and thirty-five acres of lot No. 206, belonging to the right of Moses Goodman, as run out by the commissioners for completing the division of Enosburgh."

By the ordinary rules of grammatical construction, the expression applies to both lots collectively. The commissioners defined both lots; and, if the parties had intended No. 21, according to the old lines, and No. 206 according to the new, they would doubtless have designated. Further, it does not appear that the commissioners altered the lines of No. 206, but did alter those of 21. The expression is therefore of no importance, except as applied to No. 21.

But perhaps a more satisfactory criterion, by which to determine this poiи, is the intent of Waldo, if it can be ascertained. Did he intend to submit to the decision of the commissioners? or did he intend to reserve to himself his ancient claim, according to his deed from Fasset.

There is no evidence of any intention on the part of Waldo to retain any portion of the land, or any interest in it, after the conveyance to Chilson; nor is there any ground to infer such intent. Of what service could it be to him, to retain the uncertain claim for the land, to be covered with water? If covered, it could be of no use to him, and if not, the reservation would derogate from his grant. Nor is it to be presumed, that he intended, by reserving the strip of sixteen rods wide, to interfere still further with the enjoyment of the mill site.

But a consideration still more decisive is, that it is apparent from all the deeds, that the parties understood, that precisely the same land was conveyed by all the descriptions adopted. Fasset's deed to A. Waldo describes the land, after giving metes and bounds, as "105 acres, 70 acres to the right of John Avery, and 35 to the right of M. Goodman." That from A. Waldo to G. Waldo describes it by the same metes and bounds, omitting the expression

FRANKLIN,
January,
1835.

Hull
vs.
Fuller.

above quoted.  G. Waldo's  deed to Chilson, and Chilson's deed to defendant, describe it as, " 70 acres of No. 21, belonging to the right of J. Avery, and 35 acres of lot No. 206, belonging to the right of M. Goodman, as run out by the commissioners," &c.

It is obvious then, that Waldo did not intend to reserve any part of his purchase, but to acquiesce in the doings of the commissioners, and to waive any uncertain claim, derived from a constructive possession.   All that G. Waldo could  have was an inchoate title, arising from the possession of Chilson, and as to this, the effect of his deed to Chilson has been already noticed.

Further, Waldo's possession  is to be considered with reference to his deed from A. Waldo.   From the description in this deed, compared with the plan, it is evident that the eastern boundary, (except the circuit around the imaginary pond,)  must lie further west than the east line of No. 21.   None of the deeds profess to convey the whole of No. 21, nor to the eastern  line as originally allotted.   There is then no evidence of any title in G. Waldo to the east end of No. 21, nor *any* thing upon which a constructive possession to that extent can be founded.   It is clear then, that Waldo had nothing  remaining in him, to be conveyed to the defendant, by his deed of 1824, and that Waldo himself so understood it.

Again, it is argued, that the testimony of the surveyor should have been received, tending to show, that the commissioners intended to  place the east line of No. 21 where it was originally located.   The principle upon which the court proceeded is too well settled to admit of discussion.   When the original monuments are found, no testimony can be received to show that the surveyor intended to locate the boundaries elsewhere.   Were it otherwise, the boundaries of the whole state might be disturbed.   A single error in the allotment of a town might lead  to a new allotment throughout ; and if ancient landmarks are to be disturbed, upon this principle, there would be no end to the consequences.

The testimony of the surveyor, as to the declarations of House, was clearly inadmissible, on two grounds.   In the first place, the declaration was not binding upon him, if made ; and in the second place, it could not affect the right of his grantee.   It was not an admission going to qualify his possession, but the expression of his purpose, or intent, which could not derogate from the estate conveyed by him.

The circumstance that House witnessed the deed from Fasset to Waldo, is of no importance.   It does not appear, that the claim

set up by the plaintiff in this case, conflicts with that deed, and if it did, the proceedings of the commissioners, with the assent and acquiescence of the parties, would render such claim consistent and proper.

FRANKLIN,
January,
1835.
Hull
vs.
Fuller.

Upon the whole, we see no error in the proceedings of the county court, and their judgment is affirmed.