J. P. NEILL *v.* BURTON S. WARD.

May Term 1930.

Present: POWERS, C. J., SLACK, MOULTON, and THOMPSON, JJ., and GRAHAM, Supr. J.

Opinion filed November 5, 1930.

*John W. Gordon* and *Theriault & Hunt* for the defendant.

*F. L. Laird* and *H. C. Shurtleff* for the plaintiff.

THOMPSON, J. This is an action brought under G. L. 6956 for alleged trespass and cutting standing timber on plaintiff's close described as lot 59 in the first division of lots in the town of Moretown. The defendant admitted entering the land in dispute and cutting standing timber thereon, but claimed title in himself both to the land and timber.

There was a trial by jury and a general and special verdict for the plaintiff. The defendant took exceptions during the trial to the admission and exclusion of evidence and to the court's charge to the jury, and, after verdict and before judgment, moved that the verdicts be set aside and judgment rendered for the defendant. The motion was denied, to which denial the defendant took and was allowed an exception.

The real controversy is over the location of the boundary line between said lot 59 and lot 60 in said first division of lots which is owned by the defendant.

Moretown, as shown by the original town plan, is bounded on the southeast by the town of Berlin, on the northeast by the Winooski River, on the northwest by Duxbury and on the southwest by Waitsfield, but now by Waitsfield and Northfield. There are three main divisions of lots extending northwesterly from the Berlin town line to the Duxbury town line. Starting at the town lines of Waitsfield and Northfield, and extending northeasterly, the divisions of lots are second, first, and third. The second division contains four tiers of lots, the first and third divisions, three tiers each. There are seventeen lots in each tier.

The range lines start at the Berlin town line and extend north forty-seven degrees west to the Duxbury town line. The lot lines start at the Waitsfield and Northfield town lines, and extend north twenty-eight degrees east through the tiers of lots of the three divisions. It was conceded at the trial that, as the divisions of lots were originally laid out, with the exception of the river lots hereinafter mentioned, the range lines are straight lines parallel with each other, and the lot lines are straight lines parallel with each other. It appears from the town plan and the field book, hereinafter mentioned, that, measuring on the range lines, all of the lots of the three divisions are each 116 rods wide. Measuring on the lot lines, the length of the lots vary. The lots of the first division are each 144 rods long; those of the second division are each 160 rods long; and those of the third division are each 162 rods long. Between the northeasterly boundary of the third tier of lots of the third division and the Winooski River, there are a number of lots of various dimensions called "river lots," and divided into first, second, and third division lots. The only lot line that extends unbroken from the Waitsfield or Northfield town lines to the Winooski River is the lot line that runs between lots 59 and 60 of the first division.

When lots are hereinafter referred to without stating the division they are in, first division lots are indicated. When other lots are referred to, the division they are in is given.

The plaintiff owns what is called the Herring farm, which consists of lots 57, 58, and 59. Abijah Herring, the original owner of the Herring farm, purchased lot 58 October 16, 1847. The description in his deed is: "Lot number fifty-eight (58) in the first division of lands in said town drawn to the original

right of Ebenezer Brown.'' He purchased lot 57 September 21, 1863. The description in his deed is: ''Lot number fifty-seven (57) in the first division of lands in s'd Moretown drawn to the right of James Wallace and commonly called the Spafford lot, and adjoining the farm of s'd Herring.'' He purchased lot 59 October 23, 1865. The description in his deed is: ''Lot number 59 in the first division of lots in said town drawn to the original right of Lemuel Abbott, estimated to contain 116 acres of land more or less.'' All of said deeds are warranty deeds. Certified copies of other deeds were received in evidence showing a title of record of lot 59 back to March 1, 1841.

Abijah Herring owned and occupied the Herring farm until January 9, 1907. On that day, by conditional deed, he conveyed his farm to Julius E. Martin, describing it as ''Being my home farm where I now live in Moretown, and being lots 57, 58 and 59 in the first division lots of land in said Moretown.'' The several subsequent conveyances of this property in the plaintiff's chain of title describe it as ''the Abijah Heering Farm,'' and refer to previous deeds and the records ''for a more particular description of said premises.'' The plaintiff purchased ''the Abijah Herring farm'' January 13, 1921, and has since lived on and occupied the same. The marks indicating the lines between the lots forming the Herring farm are mostly obliterated now, as no attempt has been made to preserve them, but in some places they are still visible.

A. O. Cummins, by his warranty deed dated November 29, 1882, conveyed lot 60, commonly known, and referred to at the trial below, as the Cummins lot or the Brown lot, to Joseph M. Brown and Charles J. Brown. Said lot is described in said deed as ''Being all of the first division lot in said Moretown drawn to the original right of Nathaniel Barrel.'' Reference is made in said deed to prior conveyances which show a title of record to said lot to 1830. Charles J. Brown was the son of Joseph M. Brown. Joseph M. Brown died in 1899, and Charles J. was his only heir. Charles J. Brown, by his warranty deed dated March 28, 1912, conveyed said lot 60 to his son, Leo F. Brown, and, on July 9, 1924, Leo F. Brown, by his warranty deed, conveyed the same to the defendant. The plaintiff conceded at the trial below that the defendant is the owner of lot 60.

The plaintiff claims that the dividing line between lots 59 and 60 is a little over 1,000 feet, or about a half a lot, northwest of where the defendant claims that such dividing line is located.

Before taking up the defendant's motion to set the verdicts aside, we will consider the defendant's exceptions to the admission in evidence of the field book, the town plan, and the original grant of the town of Moretown.

Lot 60 and the lots forming the Herring farm are in the third tier of lots in the first division. In laying out the lots, as shown by the town plan and the field book, this tier of lots starts at the Berlin town line with lot 53 and ends with lot 69 at the Duxbury town line. Lot 53 is described in the field book as follows. "Lot 53, Begins at a maple in the E. line of the town being the N. E. corner of No. 52; thence N. 47° W. 116$^r$ to a spruce; thence N. 28° E. 144$^r$ to a beech; thence S. 47° E. 116$^r$ to a hemlock in the Town line; thence S. 28° W. 144$^r$ to the first bound."

Lot 54 begins at the S. W. corner of lot 53, and each subsequent lot begins at the S. W. corner of the preceding lot. The courses and distances of the lines of the other lots are the same as those of lot 53, and a named tree is at each corner.

The plaintiff bases his case on the field book and town plan on the theory that the lines and dimensions of the lots of the third tier, as actually laid out on the ground, are substantially the same as described in the field book. In his opening statement to the jury, counsel for the plaintiff, after describing 'the layout of the lots, said: "So that in getting at the location of the lot lines according to the land records (meaning the field book) we begin at the east on the Berlin town line and count off the lots until we get up through 60, the last one beginning where the previous one ended, according to the land records." After stating that the defendant commenced cutting timber on lot 59 in the latter part of 1928, he further said: "Mr. Neill immediately procured the services of an engineer to go up there and survey the lot for him. He went up there, this engineer did, and found lot lines substantially as I have told you already."

The defendant claims that lot 60, as occupied by himself and his predecessors in title for more than fifteen years, has old corners and lines marked upon the ground, and that during that time they maintained exclusive possession up to the divid-

ing line as claimed by him. He further claims that the lines and corners of the lots comprising the Herring farm, as marked upon the ground, are not substantially the same as described in the field book; that lot 58, as located on the ground, is not a full lot, as described in the field book, but substantially a half lot.

The plaintiff, after introducing in evidence certified copies of deeds of his title of record and a title of record of lot 59 back to 1841, offered in evidence the town plan and certain parts of a book labeled ''The Proprietors' First Book of Record and the Field Book of Moretown.'' This book and the town plan came from the office of the town clerk of Moretown, and no question is raised as to their authenticity and genuineness.

It appears from the proprietors' records contained in said book that it was voted at the first meeting of the proprietors, held on June 13, 1798, to lay out the town into three divisions, ''the first to contain 104 acres, the second division to contain 114 acres, and the remainder in equal division for the third division as it shall(?) out.'' It is apparent that the acreage specified in said vote referred to the lots of each division and not to the division itself, as the lots of the first division, as described in the field book, contain 104.4 acres each, and the lots of the second division contain 116 each. At the same meeting a committee, of which Abel Knapp was a member, was chosen to lay out the town. At a meeting of the proprietors held on September 28, 1798, it was voted to accept the survey and return of the committee, and a draft was had of the lots of the three divisions as recorded in said book beginning with page 15 and ending with page 20.

There were evidently errors in the proceedings of some of the earlier meetings of the proprietors, and no field book had been made, as the proprietors preferred their petition to the Legislature of 1803, stating that, through the neglect of their surveyors that surveyed the town, no field book had been made nor any minutes of said survey preserved whereby a regular field book could be made, and that the former proprietors' meeting was lost through mistake, and praying for a special act to call a meeting to regulate their affairs. The Legislature did pass such an act, and a meeting was held pursuant to it· on September 11, 1804, at the dwelling house of Asa Sterne. The third article of the warning of the meeting was ''To see whether the proprietors will agree to survey & draft the town

anew, or rectify any mistakes in their former survey or draft or any of their former proceedings and complete a plan and field book of said town.'' It was voted at the meeting not to survey the town anew. It was also voted that the proprietors' committee be empowered to make an examination and to report ''what in their opinion ought to be done in order to rectify all former mistakes and also to make out a regular plan and field book of the survey of said township.''

At an adjourned meeting held on October 6, 1804, the committee reported that in their opinion all the doings of the proprietors after May 7, 1799, were illegal, and that there were mistakes in the draft and settling of lots in the first and second divisions that could not be rectified without a new draft of the lots of said divisions. It was voted to accept the report and to make a new draft of the first and second division lots. A new draft of the first division lots was then made.

At an adjourned meeting held October 8, 1804, a new draft of the second division lots was made, and it was voted ''to accept of the survey and draft of the lots in each division as now rectified & stand affixed to each proprietor's name on the new parchment plan of Moretown.'' The meeting was then adjourned to November 26, 1804.

On November 7, 1804, the Legislature passed an act authorizing and empowering the proprietors ''at any legal meeting already named or hereafter warned for the purpose to ratify and confirm the division of said town into severalty, so far as the same has been made, in fact. And such division, so ratified and confirmed, shall be good and valid in law, to all intents and purposes, any law, usage, or custom to the contrary notwithstanding.''

At the adjourned meeting held November 26, 1804, it was voted to accept all the doings of the proprietors at their meeting held at the dwelling house of Asa Sterne on September 11, 1804, with all their doings at their several adjournments, and to ratify and confirm the draft and division of said town as it then stood on the new map of said town, ''agreeable'' to the act of the Legislature passed in 1804. There were several adjournments of the proprietors' meeting until July 22, 1805, when, it having appeared that there were ''great errors and illegality'' in the meeting of September 11, 1804, and at the several adjourned meetings, it was voted that all the votes and proceed-

ings, except those relating to immaterial matters, had, done and passed at said meeting of September 11, 1804, and at any subsequent adjourned meeting, "be and the same are reconsidered and declared to be entirely null and void." The meeting then voted to dissolve.

A duly warned meeting of the proprietors was held at the house of Asa Sterne on September 20, 1805. One of the articles of the warning was to see if the proprietors would "accept and confirm any former draft or division of said township into severalty in pursuance of an act passed by the Legislature in November 1804 and to quiet the settlers on their actual settlements in said town in lieu of their drafts so far as is agreeable to law and to complete the survey and field book of said town in lieu thereof." Another article was to see if they would vote "to quiet the settlers in the possession of the lots they are actually settled on in lieu of their drafts as far as the law admits and to make a draft and division of the remainder of said township into severalty and to complete a survey and field book of said town and to rectify all mistakes now existing in the present survey and field book or any other proceedings of said proprietors."

At this meeting Wright Spalding was elected clerk. It was voted, among other things, to quiet settlers in the first division. The meeting adjourned to November 18, 1805. At the adjourned meeting on November 18, 1805, the previous vote to quiet settlers in the first division was reconsidered. It was then "Voted to establish the draft of the proprietorship as recorded in this book beginning with page fifteen and ending with page twenty." This is the draft of 1798. It was also "Voted to accept of a Field Book of this town as exhibited to this meeting by Abel Knapp, Esqr. dated Octr. 1804." After the transaction of some other business it was "Voted to dissolve the foregoing meeting."

On page 85 of the book is the heading: "Field Book or Survey of Moretown in the County of Chittenden Completed October, 1804." Then follows the descriptions of the lots of the town on pages 85 to 115 inclusive. At the conclusion of the description of the lots, on page 115, there is the following: "Attest Abel Knapp, Surveyor. These may certify that the foregoing as recorded from page 85 to the present page is a true copy of a field book as exhibited to the proprietors of Moretown

at their meeting held at the house of Asa Sterne on the 18th day of Novr. 1805. Attest Wright Spalding proprietors Clerk.''

The description of lots 60 to 53, inclusive, in the field book as recorded in ''The Proprietors' First Book of Record and the Field Book of Moretown'' were received in evidence subject to the objection and exception of the defendant.

A general objection was that the field book had no legality under the act of the Legislature of 1804; that, when the proprietors ratified and confirmed the new draft made on October 6 and 8, 1804, at the adjourned meeting held on November 26, 1804, they exhausted their authority under the act of 1804; that they had no authority to reconsider that vote at their adjourned meeting on July 22, 1805, and no authority to call the last meeting held on September 30, 1805, and no authority, at the adjourned meeting held on November 18, 1805, to establish the draft of 1798, and to accept the field book dated October, 1804, exhibited by Abel Knapp at that meeting. There is no merit in this objection.

The proprietors' meeting of September 11, 1804, was called according to the provisions of an act regulating proprietors' meetings. 2 Tolman's Compilation, Laws of Vt. 315. This act provided that the warrant for such a meeting should set forth ''the several matters and things to be transacted.'' The adjourned meetings up to and including the meeting of July 22, 1805, were but continuations of the same meeting without any loss or accumulation of powers. *Warner* v. *Moore,* 11 Vt. 385, 391. Nothing could be transacted at any of the adjourned meetings unless it could have been transacted at the called meeting. 46 C. J. 1378. Since the statute provided that the warrant for a proprietors' meeting should specify the business to be transacted, any business transacted without an article in the warning therefor was void. *School District* v. *Smith,* 67 Vt. 566, 32 Atl. 484.

All deliberative or legislative bodies, during their session, have the power to do and undo, consider and reconsider, as often as they think proper, and it is the final result only which is to be regarded as the thing done. *State* v. *Foster,* 7 N. J. Law, 101; *People* v. *Davis,* 284 Ill. 439, 120 N. E. 326, 2 A. L. R. 1650, 1655. And this Court has held that a town, like an individual, may change its purposes, and may express that change by its vote, and, unless some right in another has been

acquired or has vested under its action, no one may complain of the change. *Stoddard* v. *Gilman*, 22 Vt. 568, 573; *Cox* v. *Mount Tabor*, 41 Vt. 28, 31; *Estey* v. *Starr*, 56 Vt. 690.

It appears from the records of the meeting of September 11, 1804, and its adjourned meetings that the proprietors acted upon various matters not specified in the warning, and which the law specifically provided should not be acted upon unless set forth in the warning. There may be some doubt in this respect as to some of the other business transacted. It does not appear, however, that any right in another had been acquired or had vested under their action, and, in support of the vote of reconsideration, it will be presumed that none had been acquired or had vested. The proprietors had the power and authority at the adjourned meeting of July 22, 1805, to reconsider and declare null and void the votes and proceedings "done and passed" at the previous meetings, and, when such action was taken, they still had the authority and power to proceed under the act of November 7, 1804.

The proprietors' meeting held on September 30, 1805, was a legally called meeting. The business transacted at the adjourned meeting held on November 18, 1805, was set forth in the warning; and the votes establishing the draft of 1798, and accepting the field book exhibited by Abel Knapp were legal.

The defendant further says that the validity of the field book is open to serious doubt as it is apparent that, if it was completed in October, 1804, it had no relation to the old draft of 1798, but rather to the new draft authorized and made on October 6 and 8, 1804. We cannot agree with this contention. It appears from the records that only one survey was made, and that survey was the basis of the draft of 1798. It appears from the evidence that Abel Knapp was a surveyor, and from the records that he was a member of the committee chosen to make the survey. The field book itself had nothing to do with the drafts. It is simply a description of the courses and distances of the lines, and of the corners of the lots of the town as they were surveyed, and as they appear by number and division on the town plan.

The plaintiff offered in evidence the description of lot 59 as contained in the field book as showing its location and as giving color of title to the same, followed by possession by the plaintiff and his grantors since 1841. The defendant objected to the admission of such description of lot 59, and of the descrip-

tions of any of the lots as contained in the field book, on the ground that such descriptions were not admissible for the purpose of showing the location of any of the lots in the absence of a survey showing where those lots were actually located on the ground. After considerable discussion, counsel for the plaintiff said: ''We know where the Abijah Herring farm is, that can be found, 56 can be found. We are going to have witnesses here to testify to it, all these lots can be found by the present owners, we will show where they are, beginning at the town line, and we offer this description by metes and bounds as I have indicated in connection with our possession by ourselves and our grantors since the first of March, 1841. * * * * * We offer certified copy of the description of lots 59 back to 53, inclusive, on the town line. We offer to show that town line and 53 can be identified and followed today.'' The certified copy was admitted and the defendant was allowed an exception on the grounds stated.

In view of the theory on which the plaintiff tried the case and of the objection made by the defendant to the admission of the descriptions of the lots, we take it that the substance of the final offers of the plaintiff was that he would show that the lot lines of lots 59 to 53, inclusive, as actually surveyed and marked on the ground, were substantially the same as described in the field book. The actual location upon the ground of original lot lines will control, if capable of being ascertained. *Silsby* v. *Kinsley,* 89 Vt. 263, 270, 95 Atl. 634. In connection with this offer, the town plan and the description of the lots in the field book were admissible. The fact that the plaintiff's evidence did not come up to the offer did not affect the correctness of the ruling of the Court. *Herrick* v. *Holland,* 83 Vt. 502, 511, 77 Atl. 6.

Percy G. Smith, a civil engineer, and a witness for the plaintiff, was employed by the plaintiff to survey his farm and locate the dividing line between lots 59 and 60. A plan which he made of the plaintiff's farm from his survey, and which shows the dividing line between these lots as claimed by the plaintiff, is Plff's Ex. 27.

He testified in direct examination that he surveyed on the lines of lots 53 to 59, inclusive, and of other lots, and that he followed the range line between the first and third divisions, which is the northerly boundary of lots 57, 58, 59, and 60, from the Berlin town line northwesterly.

It appeared that in the papers of the Surveyor General there was item of the year 1784; "That in perambulating or running town lines throughout the State, one thirtieth part be allowed for swag of chain"; and Smith testified that the lots he measured figured that way.

He testified in cross-examination that he measured the range line from the Berlin town line across seven lots to the northwest corner of lot 59, as claimed by the plaintiff, with a steel tape, and the distance was 895 rods; that the actual distance from the Berlin town line to the northwest corner of lot 59 according to the town plan and field book, and with the allowance of one-thirtieth part added, was a little over 839 rods; that his actual measurements overran the distance given in the field book by about 56 rods.

The evidence showed that the northwest line of lot 59, according to the town plan and field book, is substantially where the defendant claims it is, and that the cutting complained of was within the overrun.

In the redirect examination of Smith, the plaintiff offered in evidence the original charter of the town of Moretown, having special reference to what it said about the way surveying should be done. The part of the charter referred to described the land granted as "containing by Ad-measurement, 23,040 acres, which tract is to contain six miles square, and no more; out of which an allowance is to be made for highways and unimprovable lands by rocks, ponds, mountains and rivers," etc. The court admitted the charter for what it was worth, subject to the objection and exception that it was irrelevant and immaterial to any issue, and vague as to its bearing on any issue in the case.

The plaintiff, in making his offer, declined to limit it or specify the particular purpose for which the charter was offered further than to say, in substance, that it was the foundation for all surveying in the town of Moretown; that it was a part of the field book and was offered from the field book.

▮▮ To sustain an objection on the grounds of immateriality and irrelevancy alone it should be made to appear that the evidence is clearly immaterial and irrelevant. *Slayton* v. *Drown*, 93 Vt. 290, 294, 107 Atl. 307; *In re Wells' Will*, 95 Vt. 16, 23, 113 Atl. 822; *Gomez & Co.* v. *Hartwell*, 97 Vt. 147, 155, 122 Atl. 461. We think the charter might be admissible for certain purposes, which it is not necessary to state, and that

there was no error in admitting it against the objection made.
It appears, however, that the only use the plaintiff made of the charter was as a foundation for allowance for highways, ledges, etc., not mentioned in the field book, made by Smith in his surveying to account for the overrun of fifty-six rods. It is also apparent that this was the only purpose for which the charter was offered, although it was not revealed to the court. This was an improper use of the charter, and it would have been error for the court to have admitted it for that purpose alone. As the overrun of fifty-six rods is material in considering defendant's motion to set aside the verdict, we give the reasons why the use made of the charter by the plaintiff was improper.

The charter is not a part of the field book. It is a separate document recorded in the first pages of the proprietors' book of records as required by ''AN ACT, regulating proprietors' meetings,'' passed March 9, 1787, and in force when the meetings of the proprietors of Moretown hereinbefore mentioned were held. 2 Tolman's Compilation, Laws of Vt., 315, 317. Nor is it the foundation, of the survey, town plan, and field book relied upon by the plaintiff. Section 2 of said Act of 1787 provides that the mode of division of land held in common in any township shall be as follows: ''When the proprietors are met, according to the warning, and have agreed upon the number of acres to be allotted or divided, to each proprietor, they shall chuse a committee to make survey thereof, which committee * * * shall lay out, and number one lot (or as many as the proprietors vote) to each right, and when such survey shall be made, they shall return a plan thereof to the proprietors, when met, describing the corner of each lot.'' Then follows a description of the way in which the draft of the lots should be made. The records of the proprietors' meetings show that the survey, town plan, and field book of the lots in the town of Moretown were made according to this section of the act, aided by later enabling acts. The most that can be said of the quoted portion of the charter is that it gave the committee, chosen by the proprietors to lay out and survey the lots of the town, authority to make allowances called for by it in their layout and survey; and, unless they did so, there is no basis for any one to make such allowances later. The presumption is that the committee, in making the survey, made all allowances permitted by law, and that the same are included in the lines of the lots

as shown on the town plan and described in the field book. At the trial below the plaintiff claimed that the field book showed an actual survey, and, in locating his line between lots 59 and 60, he relied upon the location and boundaries of lots 53 to 59, inclusive, as shown by the town plan and field book. It necessarily follows that, in surveying the same, he is bound by the descriptions of the lots as given in the field book. To hold otherwise would make the town plan and field book meaningless as a basis for ascertaining the location and boundaries of any particular lot, and would permit a surveyor arbitrarily to manipulate lot lines to meet the exigencies of a particular case.

There are six grounds in the defendant's motion to set aside the general and special verdicts. The special verdict is that lot 58, as it now exists in the town of Moretown, is not substantially a half lot. We do not consider the third, fifth, and sixth grounds, as their substances is embodied in the other grounds of the motion. The grounds we consider are: (1) That the verdicts are wholly unsupported by the evidence; (2) that the jury, in returning said verdicts, disregarded the testimony; (4) that, assuming that the plaintiff's evidence made a case for the jury, it was so outweighed by the countervailing evidence that intelligent and fair-minded men could not reasonably reach said verdicts.

For a proper understanding of the questions raised by the motion, we first consider the actual location of certain lots upon the ground as indicated by old marked corners and lines.

H. H. Squires, a land surveyor of experience, was a witness for the defendant. He did surveying for the defendant for the purpose of locating the dividing line between lots 59 and 60. He ran the lot line dividing lots 59 and 60 its entire length from the Northfield town line to the Winooski River, and lines of other lots that have a bearing on the location of the disputed line. A plan he made from his survey is Dft's Ex. N. So far as it represents an actual survey, it shows the lines and corners of the lots as they are actually marked upon the ground, and not as they are located on the town plan and described in the field book. Other lines on his plan indicate the general relation of the lots shown, and the effect that the line claimed by the plaintiff would have upon other lots if extended through the town.

The situation can be better understood by referring to the accompanying diagram. The lines running S. 39° E. are the

range lines. No question is made as to the location upon the ground of the range lines of the first division of lots. The lines running N. 36° E. are the lot lines. The broken lines are the lines which the plaintiff claims are the northwesterly and south-easterly lines of lot 59. The solid lines are the lot lines as claimed by the defendant or about which there is no dispute. Lots 4 to 9, inclusive, are in the third division. The other lots are in the first division. The names on the lots are the names of present or former owners of such lots and by which the lots are commonly called by those who are familiar with them. Many of the witnesses did not know any of the lots, not even their own, by number, except as they located them on the plans in evidence, but knew and called them by the names of such owners.

The parties agreed at the trial below that, as located upon the ground, a stone on the northerly range line at the southeast corner of lot 5, third, marks the southeast corner of that lot, the southwest corner of 4, third, the northeast corner of 57, and the northwest corner of 56; that a stone on the southerly range line at the southwest corner of lot 56 marks the southwest corner of that lot, the southeast corner of 57, the northwest corner of 49 and the northeast corner of 48; and that a stone on the northerly range line at the northwest corner of 57 marks the northwest corner of that lot, the northeast corner of 58, the southwest corner of 5, third, and the southeast corner of 6, third. Mr. Sleeper, who owns lots 56 and 49, was a witness for the plaintiff. He testified that the southeasterly lines of 57 and 48 were surveyed forty-five years ago, and there were a lot of old marked trees on the lines at that time. The line between lots 57 and 58 runs through cleared land, and there are no marks upon the ground to show its location. It was agreed that a line, substantially parallel with the southeasterly line of 57, extended southwesterly from the northeast corner of 58 to the southerly range line, is the line between 57 and 58, and corresponds with a similar line on the plans received in evidence. The southeast corner of 58 is not marked except as it meets the line dividing lots 48 and 47, which is a continuation of the line between 57 and 58 and is marked by a fence and stone wall.

The evidence shows that a mound of decayed wood covered with grass where an old hollow birch stump with a stake stuck

in it formerly stood, on the northerly range line, about sixty rods northwest of the northeast corner of 58, marks the northwest corner of 58, the northeast corner of 59, and the southeast corner of 7, third, called the Converse lot, and the southwest corner of 6, third, called the Charles Smith lot, as said lots are located on the ground. There is a stone monument, called the Dewart monument, about two rods northwest of this corner which was erected by Frank Dewart in 1925 when he surveyed the lines for the defendant. Mr. Dewart is dead.

Julius Converse, a man seventy years old, and who has always lived in Moretown, was a witness for the defendant. He bought the Converse lot from his father in 1887, and sold it five years ago. It had been in his family since 1854. He has known the lot since he was a boy, and was on it with his father. His father told him where the corners were. He told him that the hollow stump with the stake in it was at the southeast corner. He has seen the stump and stake a great many times, and it was a very old stump. He went to this corner the Saturday before he testified, but the stump was gone; there was a mound where the stump used to be, but all he found was "rotten wood." He was present at this old stump in 1925 when Mr. Dewart started his survey around some lots from it. He went with Dewart through two lots, but Dewart's compass must have varied because he was about two rods from the stump when he came back.

George Herring, a witness for the defendant, was a nephew of Abijah Herring. He and his wife owned and lived on the Herring farm from April, 1908, to May, 1914. Leo Brown then owned lot 60. The hollow birch stump with a stake in it marked the northwest corner of lot 58 while the witness lived on the farm. The stump was then rotted so that the stake leaned over. Every year he cut hay "clear to the stump" and "cut around the stump by hand." It was in the fence between his land and the Charles Smith lot. The fence turned at the stump and went northerly along Smith's land. In November, 1913, he employed J. A. Chapin, a surveyor, to run the line between lots 59 and 60. Mr. Chapin started his survey at the hollow birch stump at the northwest corner of 58.

A plan made by him of his survey was received in evidence. It shows a stone at the northeast and southeast corners of 57, which it is agreed mark those corners. It shows a birch stump

at the northwest corner of 58. It shows 57 and 59 as full-sized lots and 58 as a half lot.

The evidence shows that a marked line extending northeasterly from the old birch stump, on the same course as the other lot lines, is the dividing line between lots 6 and 7, third. There is old growth timber with some second growth all the way on the northwest side of this line. On the southeast side about a third of the way is open pasture, a third is brush and small trees, and a third is old growth timber with second growth mixed in with it. There are marked trees, marked five or six years ago, the whole distance of the line. Where there is old growth timber on both sides of the line there is a well-marked line of trees with old marks. The marks are of different ages; some trees have three sets of marks on them. The youngest of these old marks are not less than forty years old, and the oldest are at least seventy-five years old.

The fence described by the witness Herring as turning at the old birch stump and going northerly along Charles Smith's line was built about 1910. Smith had cleared some of his land next to the line and wanted to use it for a pasture. Julius Converse bought the wire and Smith built the fence. Converse told him to put it where he wanted to. The fence runs for some distance on lot 7, and then turns and runs easterly on lot 6 towards Smith's buildings. It was not built for a line fence.

The defendant's evidence tends to show that a pile of stones at the foot of a ledge on the northerly range line, about 126 rods northwesterly of the old birch stump, marks the northwest corner of 59, the northeast corner of 60, the southwest corner of 7, third, and the southeast corner of 8, third, as said lots are located on the ground.

It appears that when Mr. Chapin made his survey in 1913, he started with a wrong compass direction and ran the line from the old birch stump northwesterly in lot 7, third, to a point where there are now a stake and stones near a leaning maple tree, a short distance from the northwesterly line of 7 and about thirty rods northeasterly of the range line, and located the northwest corner of 59 at that point. At the trial below, this corner was referred to as the "leaning maple corner." That Mr. Chapin was skeptical of this corner is apparent from his plan. It does not appear who placed the stake and stones at that point or when they were placed there.

The defendant owned lot 7, third, in 1925. At that time there was a controversy between him and the plaintiff as to the location of the line between 59 and 7, third—the plaintiff claiming that the stake and stones near the leaning maple was the northwest corner of 59. At that time the plaintiff did not question the location of the dividing line between 59 and 60, as claimed by the defendant, but only its northwesterly terminus. He did not question its location until December, 1928, when Mr. Smith was surveying for him. Mr. Smith began his survey at the leaning maple corner but did not go far before he found that he was not on the right line, and he did not get onto the northerly range line until he came to the Dewart monument. Mr. Dewart was employed by the defendant in 1925 to locate the true dividing line between 59 and 7, third. He went to the leaning maple corner and soon found it was wrong. He located the pile of stones at the foot of the ledge as the true northwest corner of 59, and placed a stake in the pile of stones. The plaintiff admitted at the trial below that the leaning maple corner is wrong and that the true northwest corner of 59 is on the range line. He admits that the pile of stones at the foot of the ledge is on the range line, but claims now that the corner is 56 rods farther to the northwest.

Julius Converse testified that his father never showed him the southwest corner of 7, third, but told him when he bought the lot that that corner was at the foot of a ledge, that he would find a pile of stones there. He did not go to the corner at that time, but was there with Mr. Dewart in 1925, and at the foot of the ledge they found the stones "laid around as you would lay a chimney." George Herring testified that during the Chapin survey they found a stone pile at the foot of the ledge southerly of the leaning maple.

The plaintiff testified that he was present in 1925 and saw Mr. Dewart set the stake at the foot of the ledge. When he set the stake there was nothing to indicate a corner; no stones were piled there, and Mr. Dewart did not pile any; he "just drove a stake in the ground."

The evidence shows that the dividing line between lots 7 and 8, third, extends northeasterly from the stake and stones at the foot of the ledge, on the same course as the other lot lines, about 182 rods to the remains of a bridge which marked the northeast corner of said lot 8. The line is marked for some

distance from the stake and stones by trees with line marks on them about forty years old.

The defendant's evidence shows that the dividing line between lots 59 and 60, which is a continuation of the line between lots 7 and 8, third, is a marked line extending southwesterly from the stake and stones at the foot of the ledge about 152 rods to a wooden stake in the southerly range line, which marks the southwest corner of 59, the southeast corner of 60, the northeast corner of 45, and the northwest corner of 46, as said lots are located on the ground. There are several large trees along the line marked on their northeast and southwest sides which indicates that they were marked as line trees. The marks on the trees are from forty to fifty years old. J. A. Chapin located this line as the dividing line between 59 and 60 when he surveyed the lines in 1913.

The stake on the southerly range line is set in wet, swampy ground. Three or four witness trees are near the stake. They are marked with a single blaze on the side facing the stake, which is the way corners are witnessed. The stump of another stake is in the ground about nine inches from this stake, the rest of the other stake having rotted off close to the ground. The stump in the ground is at least twenty-five years old and may be one hundred years old. When J. A. Chapin made his survey in 1913, he found at the southerly end of the line a stake lying on the ground by its stump so rotten that it could not be picked up. He set another stake there near the stump. There were old blazes on the witness trees at that time which were quite dim and he renewed them. The stake that he set at this place was referred to at the trial below as the ''Chapin stake'' or ''corner.''

The evidence shows that a beech tree, now lying on the ground on the northerly range line about 126 rods northwest of the stake and stones at the foot of the ledge marks the northwest corner of 60, the northeast corner of 61, the southwest corner of 8, third, and the southeast corner of 9, third, as these lots are located on the ground. This tree is marked on four sides as a corner, the oldest marks being about fifty years old. When Mr. Dewart surveyed the lines in 1925, this tree was standing, and he marked it on four sides with the numbers of the lots cornering there.

The evidence shows that a stake and stones on the southerly range line near a hardhack tree with a blaze on one side, about 152 rods southwest of the beech tree corner, marks the southwest corner of 60, the southeast corner of 61, the northwest corner of 45, and the northeast corner of 44, as these lots are located on the ground. Mr. Squires testified that when he surveyed the lines in 1928, he found that the stake at this corner had been set recently, but the pile of stones was old, and an old stake was lying on the stones. It appeared that Mr. Dewart located the stake and stones as the southwest corner of 60 in his survey of 1925. At that time the old stake was standing in the pile of stones. He cut a new stake and put it in place of the old one and laid the old stake on the stones beside it.

It also appeared that about forty-six years ago one Fred Willey and his brother purchased a narrow strip of twenty-five acres of timber land lying northwesterly of lot 60. Their lower corner at which they started to measure out their land was the hardhack tree corner. The Brown lot cornered there. At that time there was a stake with stones piled around it at the corner. There was a hardhack tree blazed on one side six or seven feet from the stake.

Albert Wade, a witness for the defendant, has owned lot 44, lying westerly of and cornering on lot 60, for twenty-eight years. Mr. Royce, the man from whom he bought, pointed out the hardhack tree and stake and stones to him as the corner of the lot before he bought it. At that time Royce told him that the original line ran right through there. He has been on the line running southwest from the corner (line between 44 and 45) and "it is marked on trees all the way along that original line." When he bought the lot, the marks on the trees were several years old, and the hardhack tree had marks on it that were several years old.

The evidence shows that a stake and stones on a ledge on the range line southerly of lots 45 and 46, at the northeast corner of lot 26, marks the northeast corner of 26, the northwest corner of 25, the southwest corner of 46 and the southeast corner of 45, as said lots are located on the ground. Henry Church, a witness for the defendant, and who owns a part of lot 25, lived on 45 or 46 when he was a boy.

Forty-five years ago, when he was twelve years old, a surveyor by the name of Holt surveyed the lines of lot 26. He was with Holt and his party during all of that survey, and knows where the lines and corners of 26 are located as marked upon the ground. At that time a pile of stones on a ledge marked the northeast corner of 26, and that corner has always been so marked.

Lot 60 and some of the lots in its immediate vicinity are timber lots. Where there is timber the range lines are well marked by line trees with old marks.

The evidence shows that the northwesterly lines of 8, third, 60, and 45 make one continuous straight line which is marked its whole length by line trees with marks of various ages ranging from five years to one hundred and thiry years, which shows that the line or parts of it have been surveyed more than once. Several of the marked trees were old trees, one hundred years or more old. Many of the marks were fifty or more years old. Mr. Squires found one very old marked tree on the northwesterly line of 8, third, sixteen or twenty feet from the beech tree corner. The tree was about thirty inches through and he thought it was about three hundred years old. He cut out one of the marks on it and it was approximatedy one hundred and thirty years old, which would indicate it was first marked about the time of the original survey. The evidence also shows that the continuous straight line intersects the northerly range line at the beech tree corner and the southerly range line at the hardhack tree corner.

There are the remains of an old camp on lot 60 southeast of the middle of the lot and on the land claimed by the plaintiff. C. J. Brown built the camp about forty-six years ago and cleared about half an acre of land around it. He and his family lived there two or three years and it was occupied by him for many years in his lumbering operations on the lot. In 1908, Leo Brown, son of C. J. Brown, took most of the remains of the camp and moved them to their home in East Moretown.

Herring brook flows southeasterly through the Herring farm. A branch of it flows down through lots 60 and 59. A log road formerly extended from the main highway near the buildings on 58 up through 58, 59, and 60 to the Brown camp. There were two bridges on the log road across the branch of the Herring brook near where the defendant claims the line be-

tween 59 and 60 is located. The first bridge was easterly of the line in 59, and the other bridge was westerly of the line in 60. The defendant's line is on the top of a rise between the bridges about a rod or so beyond the first bridge.

About 1895, C. J. Brown first pointed out the line at the top of the rise to Leo Brown as the line between his land and Herring's, and also pointed out marked trees along the line. Sometime before 1909, soon after the owner of lot 45 had his lines surveyed, C. J. Brown pointed out the stake at the Chapin corner and the stake and stones at the hardhack tree corner to Leo Brown as the southeast and southwest corners of his lot, and also pointed out some marked trees on the line between those corners.

James McNulty, a witness for the defendant, worked for C. J. Brown on lot 60 at different times beginning about thirty-five years ago. One time, when they were cutting timber near the Herring farm, Brown pointed out the line between his land and the Herring farm to them to limit their cutting. The line he pointed out was on the rise just beyond the first bridge. There were several trees with old marks on them on the line as far as they worked. They cut clear to the line. Another time he was chopping for Abijah Herring near the line, and Herring pointed out the same line to him as his line.

The foregoing evidence as to the marks upon the ground locating the corners and boundaries of 58, 59, 60 and adjacent lots is not contradicted except by the testimony of the plaintiff that there was no pile of stones at the foot of the ledge on the northerly range line when Mr. Dewart set a stake there, and by the testimony of Mr. Smith that when he went to that place in December, 1928, the stones piled around the stake were new stones and not old stones. But their testimony does not contradict the evidence that the stake and stones at that point in fact marks the northwest corner of 59 and the northeast corner of 60 as the boundaries of said lots are marked upon the ground.

Mr. Smith never surveyed the southeasterly and northwesterly lines of 60 as claimed by the defendant, and it does not appear that he ever saw the beech tree corner or the hardhack tree corner. He saw the Chapin corner on the southerly range line, but he did not consider that it and the stake and stones at the foot of the ledge on the northerly range line were corners because the stakes were new. He knew that the Dewart

monument purported to be a mark at the northwest corner of 58, but he gave it no consideration as such in locating the lines of 58 and 59.

The plaintiff locates 58 and 59 by measuring said lots northwesterly from the northwest line of 57, as that lot is located on the ground, according to the dimensions of said lots as described in the field book. This, on paper, locates the line between 58 and 59 a half a lot northwesterly of the old birch stump, and the line between 59 and 60 where the plaintiff claims it is.

This method of locating said lots is based upon two assumptions. First: That the agreement of the parties as to the location of lot 57 on the ground is a concession by the defendant that its location on the ground is identical with its location as shown by the town plan and field book. Second: That lot 58 could not have been located on the ground as a lot smaller than it is shown to be by the town plan and field book.

The defendant denies that he ever conceded or agreed that the location of lot 57 on the ground is identical with its location as shown by the town plan and field book. The plaintiff's assumption of this claimed concession is unwarranted. When the parties agreed to the location of 57 on the ground nothing was said about that location being identical with its location as shown by the town plan and field book; and the plaintiff has failed to point out any evidence from which such concession can be inferred. In fact, there is no such evidence.

From the outset of the trial below, the defendant's claim has been based on the location of the lots in question as indicated by ancient marked lines and corners, and that lot 58, so located, is a half lot. Before the agreement was made, Mr. Smith testified that none of the lines of the lots surveyed by him conformed with their description in the field book, and that the dividing line between 59 and 60, as located by him, is 56 rods northwesterly from the same line when located by the field book measuring northwesterly from the Berlin town line; and it had appeared that, according to the field book, said dividing line is substantially where the defendant claims it is.

The claim of the plaintiff that lot 58, as located on the ground, could not be a small lot, requires a consideration of the evidence.

In support of the method by which he locates lots 58 and 59 on the ground, the plaintiff claims that, since the description of these lots in the deeds is by number, "it is the same as though the descriptions contained in the field book had been copied into the deeds, and the land embraced therein conveyed thereby"; that such deeds gave the grantees color of title to the lots as described in the field book, and that actual possession of a part of the lots by the grantees was extended by implication to the whole of the lots; that since a part of each lot, at least, has been occupied adversely by the plaintiff and his grantors for more than fifteen years under their deeds, he has a perfect title to the whole of the lots as shown on the town plan and described in the field book. This claim of the plaintiff is correct as a general statement of the law, and it applies with equal force to the limits of lot 60 and the title to, and possession of, said lot by the defendant and his grantors, as said lot is described in the defendant's chain of title as "Being all of the first Division lot * * * drawn to the original right of Nathaniel Barrel," which the town plan shows is lot 60.

It is conceded that the plaintiff owns lot 59 and that the defendant owns lot 60. The line between these lots is a common line. Each party and his grantors have had actual and constructive possession of his lot to this common line for more than sixty years. The burden is upon the plaintiff of showing that the location of this common line upon the ground is where he claims it is. *Downer* v. *Tarbell,* 61 Vt. 530, 533, 17 Atl. 482.

A precise statement of the effect of a description in a deed of a lot by reference to its number is given in *Spiller* v. *Scribner,* 36 Vt. 245, 247, and followed in *Silsby* v. *Kinsley,* 89 Vt. 263, 269, 95 Atl. 634, and in *D'Orazio* v. *Pashby,* 102 Vt. 480, 150 Atl. 70. It is there said that such a description "is a description in its legal effect according to the lines of such lot *as surveyed and established* in the original division of the town, and is just as definite, although not so particular, as it would be if the lines were given, and should receive the same construction and have the same legal effect in one case as the other." Described thus, the lot lines, if surveyed upon the ground, serve as monuments in fixing the boundaries. *Silsby* v. *Kinsley, supra.*

█ So far as it appears from the evidence, the lines and corners of lot 59, as claimed by the plaintiff, are not marked upon the ground. Mr. Smith testified that no southeast corner of 59, as laid out by him, can be found marked on the ground; and there is no evidence tending to show that there is a northeast corner of such lot marked on the ground or that there are any marks on the ground showing the location of the southeasterly line of such lot. Mr. Smith testified that there is no northwest corner or southwest corner of such lot marked on the ground; that he surveyed the northwesterly line of such lot, but found no marks along that line; that there were a number of "fairly old trees" along the line, but he found no marks on them. It does not appear from the evidence that he found any marks of any kind or age indicating the location of that line. The fact that there are no marks upon the ground to indicate the location of the lines of 59, as claimed by the plaintiff, is strong evidence, if not conclusive, that such lines were never surveyed, or if surveyed, they cannot be ascertained.

█ The actual location upon the ground of original lot lines will control, if capable of being ascertained. *Silsby* v. *Kinsley, supra.* When such lines have never been surveyed, or if surveyed, their location upon the ground cannot be ascertained, but the lines have been actually run and marked upon the ground, and have been recognized as correctly located for ·more than fifteen years by all parties in interest, such actual lines and monuments, marked upon the ground, constitute the survey, and, where found, will control the courses and distances named in the original layout. *Richardson* v. *Chickering,* 41 N. H. 381, 77 A. D. 769; *Pyburn* v. *Campbell,* 158 Ark. 321, 250 S. W. 15; *Rowell* v. *Weinemann,* 119 Iowa, 256, 97 A. S. R. 310; *George V. Thomas,* 16 Texas, 74, 67 A. D. 612; *Hall* v. *Davis,* 36 N. H. 569; *Warren* v. *Pierce,* 6 Greenl. (Me.) 9, 19 A. D. 189; *Le Compte* v. *Lueders,* 90 Mich. 495, 51 N. W. 542, 30 A. S. R. 450; *Watrous* v. *Morrison,* 33 Fla. 261, 14 So. 805, 39 A. S. R. 139, 142; *Martin* v. *Carlin,* 19 Wis. 454, 88 A. D. 696.

In *Hall* v. *Davis, supra,* the court said: "That, in the description of a line, what is most material and certain shall control that which is less material and uncertain; that boundaries marked on the land, as being most material and certain, are to govern courses and distances; that if the plan, or the line described in a deed or charter, and the monuments made by an

original survey of a tract or township of land, do not correspond, the monuments are always to determine the true location and that the marks on the ground of an old survey, indicating the lines originally run, are the best evidence of the true location of that survey. * * * And it may be regarded as well settled, that where land is conveyed by a deed referring to a plan or to a charter line, between which and the actual original survey, as shown by fixed monuments upon the ground, there is a difference in the courses and distances, or in the location of lines and monuments, the lines and monuments, as originally located and marked on the ground, are to govern, however they may differ from those represented on the plan, or described in the charter.''

In *Martin* v. *Carlin, supra,* the court, quoting from *McClintock* v. *Rogers,* 11 Ill. 279, 296, a leading case, said: ''The original monuments, when ascertained, afford the most satisfactory and we may say conclusive evidence of the lines originally run, which are the true boundaries of the tract surveyed, whether they correspond with the plat and field notes of the survey or not. All agree that courses, distances and quantities must always yield to the monuments and marks erected and adopted by the original surveyor, as indicating the lines run by him. These monuments are facts; the field notes and plats indicating courses, distances and quantities, are but descriptions, which serve to assist in ascertaining those facts. Established monuments and marked trees not only serve to show with certainty the lines of their own tracts, but they are also resorted to, in connection with the field notes and other evidence, to fix the original location of a monument or line which has been lost or obliterated by time, accident or design.''

In *Hull* v. *Fuller,* 7 Vt. 100, 110, this court said: ''When the original monuments are found, no testimony can be received to show that the surveyor intended to locate the boundaries elsewhere. Were it otherwise, the boundaries of the whole State might be disturbed. A single error in the allotment of a town might lead to a new allotment throughout; and if ancient landmarks are to be disturbed, upon this principle, there would be no end to the consequences.''

The rule is similar where there is a conflict between courses and distances on the one hand, and known boundaries and monuments on the other, mentioned in the description in a deed. In such cases the courses and distances, as a general

rule, must yield to the known boundaries or monuments, because it is more likely that there would be a mistake or misunderstanding about the course or distance than about the boundary or monument. *Keenan* v. *Cavanaugh*, 44 Vt. 265; *Fullman* v. *Foster*, 68 Vt. 590, 594, 35 Atl. 484, and cases cited; *Sowles* v. *Butler*, 71 Vt. 271, 276, 44 Atl. 355; *Vermont Marble Co.* v. *Eastman*, 91 Vt. 425, 448, 101 Atl. 151.

All lands are supposed to be actually surveyed, and where a deed describes a lot by its number according to a plan, the intent is to convey the land according to that actual survey. Consequently, if marked lines and marked corners are found, courses and distances must yield to them. *Riley* v. *Griffin*, 16 Ga. 141, 60 A. D. 726, 729; *Bean* v. *Batchelder*, 78 Me. 184, 3 Atl. 279. In the latter case, where a plan had been made to delineate an actual survey, and a deed described a lot by number according to that plan, the court, in holding that an actual survey upon the ground, rather than the plan, fixed the location and boundaries of the lot, said: ''The plan was merely a picture. The survey was the substance. The plan was not made to show where the lots were to be hereafter located, or how they were to be hereafter bounded. It was made as evidence of where they had before been located and bounded. The lot actually surveyed, bounded by the lines actually run, was the lot intended to be conveyed. The plan was named in the deed, rather as a picture, indicating the location and lines of the lot. Still the actual boundaries, rather than the pictured boundaries, were to be sought for. The picture might not be wholly accurate.''

Another rule is that resort may be had to the lines of adjacent lots to determine the location of a lot when its location on the ground cannot be ascertained. *Silsby* v. *Kinsley*, *supra; Bristol Mfg. Co.* v. *Palmer*, 82 Vt. 438, 74 Atl. 76.

Since the plaintiff admits that there are no marks upon the ground locating the lines of lots 59 and 60 as claimed by him, it necessarily follows that the location of said lots must be determined by the actual lines and monuments as marked upon the ground, and, if necessary, resort may be had to the established lines of adjacent lots.

The northwesterly line of lot 58 is not marked upon the ground unless the old birch stump is a corner, and this is questioned by the plaintiff. Lot 6, third, lies directly northeast of

58 and lot 47 lies directly southwest. It is conceded that these lots are the same width and that their lot lines form two continuous straight lines parallel with each other. The plaintiff assumes these facts in locating.his northwesterly lines of 58 and 59, and also assumes that 58, 47, and 6, third, are full-sized lots. No question is made as to the southeasterly lines of these three lots. The southeasterly line of 47 is marked by a fence and stone wall.

Aaron H. Martin bought 45 acres of land in the northeast corner of lot 5, third, in 1864. He purchased lot 6, third, in 1869. In 1890, the administrator of his estate conveyed said two parcels of land to the Northfield Savings Bank. After several mesne conveyances of said lands, in which they are described as being 115 acres, the bank again became the owner of the same. The bank conveyed the premises to Hiram Sanders October 5, 1895, the description in the deed being: "The farm now occupied by said Sanders, bounded as follows: North by land of James Kelley, east by the land of Jessie Willey and land occupied by the widow McNulty. South by the land of Abijah Herring and west by land of Julius Converse, containing 115 acres more or less." Sanders reconveyed the premises to the bank February, 1902, and the bank conveyed the same to Charles Smith, April 7, 1902; the description in the deed being: "The same premises deeded said Bank * * * by Hiram Sanders and wife. Reference to said deed being had and to other previous deeds for a more definite description. Said premises supposed to contain one hundred and fifteen acres more or less."

The description in the deed from the bank to Sanders of the land now owned by Charles Smith as bounded "west by land of Julius Converse" makes the Converse lot a monument; and this monument must control the location of the northwesterly line of 6, third, rather than the courses and distances described in the field book. *Park* v. *Pratt,* 38 Vt. 545, 552; *Church* v. *Stiles,* 59 Vt. 642, 10 Atl. 674; *Cutler* v. *Barber,* 93 Vt. 468, 474, 108 Atl. 400; *Viall* v. *Hurley,* 94 Vt. 410, 416, 111 Atl. 395; *Vermont Marble Co.* v. *Eastman,* 91 Vt. 425, 448, 101 Atl. 151; *Bryant* v. *Maine Cent. R. R. Co.,* 79 Me. 312, 9 Atl. 736; *Curtis* v. *Francis,* 9 Cush. (Mass.) 427, 435. The undisputed evidence shows that the southeasterly line of the Converse lot (7, third) abutting the westerly side of Smith's land is a line of marked trees running northeasterly from the old birch

stump on the northerly range line. This definitely fixes that marked line as the northwesterly line of 6, third, and makes it a small lot. That it is a small lot, as marked on the ground, is further shown by its acreage. The deeds of the Smith farm describe it as containing 115 acres. As forty-five acres of this farm is in 5, third, the part of the farm comprising lot 6 is not more than seventy acres. It also appears that from 1856 to 1870, a time when it was shown as a distinct parcel of land, said lot 6 was in the grand lists and appraisals at sixty acres. Since 1870 the whole farm has been listed at 115 acres.

Lot 47 is owned by Cornelius Hayes. Thomas Winter and his wife conveyed to John Shanley ''the north half'' of this lot together with eleven acres and forty-five rods off the south end. By successive conveyances, in which this piece of land is decribed as containing forty-two acres and twenty-five rods, the title to it came to Cornelius Hayes, December 3, 1895, and he has owned it since then. This piece of land, from 1852 to 1866, a period during which it can be identified on the grand lists and appraisals, was set to the owners at forty-two acres. If eleven acres and forty-five rods of this piece of land is in the south end of 47, it follows that the north half of the lot is about thirty-one acres, and the whole lot is sixty-one and three-fourths acres, which makes it a small lot. There is a highway along its northwesterly side. Cornelius Hayes was a witness called by the plaintiff. He testified in direct examination that he was on one side of the highway and Moody, who owns lots 45 and 46, was on the other side, that there is a fence on each side of the highway. He testified in cross-examination that the fence on the northwesterly side of the highway is the dividing line between his land and Moody's. The town plan and field book show that 46 abuts 47 on the northwest. It appears from Smith's plan, Plff's Ex. 27, that the northeast line of Hayes' land is 1,000 feet long and the southwest line is 963 feet long, which makes 47 a half lot.

It appears from the plans in evidence that if the northwesterly line of 47, as marked on the ground by the fence on the northwesterly side of the highway, is extended northeasterly on the course of the lot lines, it is substantially parellel with the southeasterly lines of 47, 58, and 6, third, and meets the northwesterly line of 6, third, and intersects the northerly range line at, or substantially at, the old birch stump. This makes 58 a

small lot; but it is not the only evidence that it is a small lot. Thirty years ago Abijah Herring wanted George Herring to take a deed of 58 and care for him the rest of his life. At that time he told George Herring that lot 58 was a small lot; that it was not a full lot. It has already appeared that more than thirty years ago he pointed out the marked line between 59 and 60 to James McNulty, who was then chopping for him, as the northwesterly line of 59.

There is not space enough between the marked northwesterly line of 59 and the northwesterly line of 57 for two full-sized lots, but only for one full-sized lot and a half lot. It is conceded that 59 is a full-sized lot. Herring's deed of it describes it as "estimated to contain 116 acres of land more or less." Lot 58, then, as located on the ground, must be a half lot. *Warren* v. *Pierce*, 6 Greenl. (Me.) 9, 19 A. D. 189. In that case the proprietors voted to lay out their town in one hundred-acre lots. The question was as to the location of lot 8, which was owned by the plaintiff. At the trial in the lower court, the plaintiff located lots 7 and 9 on the ground beyond controversy. The area between these lots was 200 acres. The trial judge instructed the jury that irrespective of acreage, 8 must be presumed to extend from 7 to 9 unless a different location was shown. The supreme court said: "He would have been justified in using stronger language, and in stating that 8 did and must extend from 7 to 9, unless a different original location could be shown. * * * The proprietors voted, it seems, to lay out their town in one hundred-acre lots. But it is of no consequence what they proposed or intended to do; and the question is, What have they done by their surveyors or other agents duly authorized? Their intention as manifested by their vote was very inaccurately executed. * * * If the defendant could have shown original corners, or a line dividing the space between 7 and 9, the case would have been differently presented."

Mr. Smith testified that the acreage of the Herring farm, as claimed by the plaintiff, is 334 acres divided as follows: Lot 57, 107 acres; lot 58, 110 acres; lot 59, 117 acres. It appears, however, that from 1856 to 1863, during which time Abijah Herring owned 58, all the land set to him in the grand lists and appraisals was 60 acres; that after he bought 57 in 1863, his farm was listed in 1864 and 1865 at 171 acres; that after he

bought 59 in 1865, his farm was listed from 1866 to 1874 at 277 acres, and from 1874 to the present time it has been listed at 280 acres. Mr. Smith testified that the difference of 56 acres between the acreage of the Herring farm, as claimed by the plaintiff, and its acreage, as shown by the grand lists and appraisals, is the acreage of the land in dispute.

It also appears that for a few years prior to 1856, lot 6, third, was listed at 112 acres, and lot 58 at 110 acres. It does not appear why the acreage of these lots was changed in 1856, unless it can be inferred that it was changed to conform to the fact that the lots are small lots as located on the ground.

The plaintiff, in support of his northwesterly line of lot 59, relies upon a line of marked trees with old marks on them extending southwesterly from the southerly range line about half the length of lot 45. He claims that these marked trees are on the dividing line between 45 and 46. The true dividing line between 45 and 46 is a continuation of the true northwesterly line of 59. The plaintiff, to have this marked line a continuation of the northwesterly line of 59, assumes that 47 is a full-sized lot, and Cornelius Hayes owns only the southeast half of it. He arbitrarily locates his southeasterly line of 46 a half a lot northwesterly of Hayes' northwesterly line. He then measures 2,180 feet to the line of marked trees, and calls that line the dividing line between 45 and 46. This makes that northwesterly line of 46 a continuation of plaintiff's northwesterly line of 59, but it places the line a half a lot northwest of the Chapin corner and the stake and stones on the range line southerly of 45 and 46, which are respectively the northwest and southwest corners of 46 as marked on the ground, and leaves a half of a lot between 46 and Hayes' land that is owned by no one.

The defendant claims that this line of marked trees is nothing but an old marked line dividing the northeast and northwest quarters of lot 45. Lot 47, as we have already said, is a small lot, and the southeasterly line of 46 is the fence on the northwesterly side of the highway, as said lots are located on the ground. With the lots so located, the line of marked trees is in the middle of the northerly half of 45. The trees are marked as line trees and it appears that lines between divisions of lots are some times marked that way. It also appears that for many years before 1892, Patrick Keough owned the northeast

quarter of 45 and John Carrigan owned the northwest quarter. In 1892 these quarters were conveyed to a common grantee, and 45 and 46 are now owned by Mr. Moody. There is nothing to indicate that the line of marked trees was intended as a lot line. There is no marked corner at either end of it, and, if extended either way, it does not intersect any range line at a marked corner nor coincide with any marked lot line; but it is consistent with the theory that it marked the dividing line between the two quarters of the northerly half of 45 when they were owned separately.

There are certain definite conclusions that can be drawn from the fact hereinbefore set forth and the evidence: (1) That there was an original survey of the lots in question; (2) that there are no marks upon the ground from which it can be inferred that lots 58, 59, and 60 were surveyed and located on the ground, as claimed by the plaintiff; (3) that there are old marked lines and corners on the ground, existent when first seen by the several witnesses, which have been recognized and acquiesced in as the true boundaries of the lots in question by their owners and those interested for more than thirty years, and that such marked lines and corners are evidence of the lines originally run, and determine the boundaries of the lots in question as they are located on the ground; (4) that the line of marked trees between lots 59 and 60, as claimed by the defendant, is the true dividing line between said lots as located on the ground.

As hereinbefore stated, it appears from Mr. Smith's testimony that, if the theory on which the plaintiff started to try the case is followed by starting at the Berlin town line with lot 53 and measuring off the lots according to their descriptions in the field book, the distance to the northwest corner of lot 59 is 839 rods, which locates the northwesterly line of 59 where, or very close to where, the defendant says it is. The distance from the Berlin town line to the northwest corner of lot 59 as claimed by the plaintiff, and measuring 58 as a full-sized lot, is 895 rods, an overrun of 56 rods. At the trial below, the plaintiff attempted to account for this overrun by making allowances not contained in the field book, but we have already held that he could not do that; that, in measuring lots according to their descriptions in the field book, he is confined to the courses and distances of the lot lines

as actually given in the book, plus an allowance of one unit in thirty for swag in chain. Mr. Smith started at the northeast corner of lot 57 when he measured the distance of 895 rods, and measured both ways, 525 rods through four lots to the Berlin town line, and 370 rods through 57, 58, and 59 to his northwest corner of 59.

The total width of the four lots from the Berlin town line to the northeast corner of 57 according to the town plan and field book is 479 rods, which shows an overrun of forty-six rods in the width of said lots as located on the ground. The total width of lots 57, 58, and 59, according to the town plan and field book, is 360 rods, an overrun of ten rods in the width of said lots as located on the ground by the plaintiff. These measurements show that lot 57, as located on the ground, is forty-six rods farther to the northwest than is shown by the town plan and field book.

It is apparent that there was a departure from the town plan and field book in the actual surveying and marking of the boundaries of the lots on the ground; in fact, it appears from the records of the proprietors' meetings that there were mistakes in the original survey, and trouble in the early settlement of the lots in the first division. It is clear that there was an expansion of lots between 57, as located on the ground, and the Berlin town line; and it is a reasonable explanation to say that 58 was located on the ground as a small lot to compensate for the same. Mr. Smith, in locating the plaintiff's northwesterly line of 59, according to the town plan and field book, ignored the forty-six rods overrun in the lots northeast of 57 and the ten rods overrun in lots 57, 58, and 59, and erroneously assumed that the location of 57 and 58, as marked on the ground, was the same as their location as shown by the town plan and field book. If, in surveying the Herring farm, he had followed the boundaries of the lots as marked upon the ground, he would have located his northwesterly line of 59 where the line of marked trees is.

There remains the question of adverse possession as affecting the location of the dividing line betwen 59 and 60 on the ground. As we have hereinbefore said, where a deed describes a lot by its number, according to a plan, the intent is to convey the land as actually surveyed and marked upon the ground. Since it appears that the location of the dividing line

as marked upon the ground and as shown by the town plan and field book are substantially the same, the actual possession of a part of 59 by the plaintiff and his grantors would not extend by implication beyond that line. *Shedd* v. *Powers,* 28 Vt. 652; *Fullam* v. *Foster,* 68 Vt. 590, 596, 35 Atl. 484; *Rice* v. *Chase,* 74 Vt. 362, 368, 52 Atl. 967; *Silsby* v. *Kinsley,* 89 Vt. 263, 273, 95 Atl. 634. There is no evidence that Abijah Herring or any subsequent owner of 59 claimed to own any land northwest of the dividing line as marked upon the ground until the plaintiff made such claim a short time before this suit was brought. Abijah Herring claimed to own only to this marked line; and the undisputed evidence shows that C. J. Brown, Leo Brown and the defendant have had actual and constructive possession of lot 60 to this marked line under a claim of title since 1882.

We have considered all of the evidence in the case and are satisfied that on the undisputed facts lot 58 is a small lot, and that the plaintiff has failed to show title to any land northwest of the dividing line between lots 59 and 60 as said line is marked upon the ground. The court below erred in denying the motion of the defendant to set aside the verdicts.

The defendant asks in his motion that the verdicts be set aside and judgment rendered for the defendant.

It has long been the established rule of practice in cases brought into this Court upon exceptions to finally dispose of the case here, particularly, when the question raised was as to the sufficiency of the undisputed evidence to support a verdict. If the exception was to the overruling of a motion for a verdict, and the exception was sustained, this Court rendered such judgment as the trial court should have rendered, unless a jury trial became necessary or the decision of this Court placed the case in such a state that either party had a right to a trial by jury. *Bass* v. *Rublee,* 76 Vt. 395, 400, 57 Atl. 965; *Riggie* v. *Grand Trunk Ry. Co.,* 93 Vt. 282, 107 Atl. 126.

When the question as to the sufficiency of the evidence to support a verdict was raised in some way other than by a motion for a directed verdict, and the exception was sustained, the judgment was usually reversed and the cause remanded. But under our present practice the rule is that when it is clearly apparent that on another trial the party against whom reversal is made cannot strengthen his case by a proper amendment of his pleadings, or by the introduction of new

and additional evidence, we render such judgment as the trial court should have rendered, thereby saving the parties the needless trouble and expense of a new trial. *Wetherby's Admr.* v. *Twin State Gas Co.,* 83 Vt. 189, 201, 75 Atl. 8, 25 L. R. A. (N. S.) 1220, 21 Ann. Cas. 1092; *Derosia* v. *Ferland,* 83 Vt. 372, 385, 76 Atl. 153, 28 L. R. A. (N. S.) 577, 138 A. S. R. 1092; *Davis* v. *B. & M. R. R.,* 86 Vt. 205, 210, 84 Atl. 818; *Johnson* v. *Bennington, etc., Ry. Co.,* 87 Vt. 519, 523, 90 Atl. 507; *Globe Granite Co.* v. *Clements,* 92 Vt. 383, 104 Atl. 104; *Riggie* v. *Grand Trunk Ry. Co.,* 93 Vt. 282, 287, 107 Atl. 126; *Booth* v. *N. Y. C. R. R. Co.,* 95 Vt. 9, 16, 112 Atl. 894. But if it appears, or is made to appear, that it is probable that the party against whom reversal is made will be able to make a stronger case on another trial than he made at the former trial, or that an injustice will be done by rendering final judgment in this Court, the cause will be remanded. *Kennett* v. *Tudor,* 85 Vt. 190, 81 Atl. 633; *Lapoint* v. *Sage,* 90 Vt. 560, 99 Atl. 233; *Manley* v. *B. & M. R. R.,* 90 Vt. 218, 222, 97 Atl. 674; *Hebard* v. *Cutter,* 91 Vt. 218, 99 Atl. 879; *Rice* v. *Bennington County Bank,* 93 Vt. 493, 512, 108 Atl. 708; *Gaines* v. *Baldwin,* 92 Vt. 451, 104 Atl. 825; *Bradley* v. *Blandin,* 94 Vt. 243, 256, 110 Atl. 309; *O'Boyle* v. *Parker-Young Co.,* 95 Vt. 58, 63, 112 Atl. 385; *Peters* v. *Estate of Poro,* 96 Vt. 95, 106, 117 Atl. 244, 25 A. L. R. 615; *Parker* v. *Bowen,* 98 Vt. 115, 120, 126 Atl. 522; *Weinberg* v. *Roberts,* 99 Vt. 249, 131 Atl. 14.

Our disposition of the case depends upon the conclusiveness upon the plaintiff of the dividing line between lots 59 and 60 as marked upon the ground.

Since upon the plaintiff's theory of the case the dividing line, according to the town plan and field book, is substantially where the line of marked trees is, we are unable to see how the plaintiff can make a better case on a new trial.

The undisputed evidence of the age of the marked lines and corners of the lots in question and of adjoining lots, and the facts that such lines have been recognized and acquiesced in as the true lot lines by all parties in interest for so many years, and that other surveys of these lots have followed these same lines, are, in the absence of some proof of other lines located and fixed in the original survey, conclusive that they are the true lines and corners located and marked in the original survey. *Hanlon* v. *Ten Hove,* 235 Mich. 227, 209 N. W. 169,

171, 46 A. L. R. 788; *Dupont* v. *Starring*, 42 Mich. 492, 4 N. W. 190, 191; *Haring* v. *Van Houten*, 22 N. J. Law, 61, 72.

In *Dupont* v. *Starring*, Justice Cooley said: "It has been repeatedly held by this court that a boundary line long treated and acquiesced in as the true line, ought not to be disturbed on new surveys. * * * Fifteen years' recognition and acquiescence are ample for this purpose, * * * and in view of the great difficulties which often attend the effort to ascertain where the original monuments were planted, the peace of the community requires that all attempts to disturb lines with which the parties concerned have long been satisfied should not be encouraged." *Diehl* v. *Zanger*, 39 Mich. 601.

In *Hanlon* v. *Ten Hove*, the court said: "The original survey may have been inaccurate, the lines may not correctly fix the boundary, but if they have been acquiesced in for a sufficient length of time they fix the 'true line' as matter of fact and as matter of law."

In *Haring* v. *Van Houten*, the court said: "A wrong acquiescence, even in an erroneous location, will conclude parties. Considerations of public policy forbid that such errors should be corrected after long acquiescence, where, as in the present instance, the consequence would be a corresponding change in the possession of a whole neighborhood."

Furthermore, the marked line between lots 59 and 60 has been recognized and acquiesced in as the true dividing line between the lots by their owners for more than thirty years, accompanied by continued possession with reference· thereto. The rule is well settled that adjoining owners may thus establish the division line of their lands, which will be binding upon them and their privies. *Soulia* v. *Stratton*, 99 Vt. 304, 131 Atl. 610, and cases cited. In *Clark* v. *Tabor*, 28 Vt. 222, it is held that the recognition by the owners of adjoining lots of a particular line as their division line, and their acquiescence in it for a period of fifteen years, will establish it and make it thereafter binding, if, during that time, the owners had a continued, although it was only a constructive, possession of their lots.

In *Burton* v. *Lazell*, 16 Vt. 158, 161, this Court said: "And when a line is marked between the lots to which both parties claim as the division line for more than fifteen years, this is considered as decisive evidence that the line thus acquiesced in

is the true line; and it is not to be disturbed by any survey or new line made after that period has elapsed.''

Moreover, although the defendant fully briefed this question that on the uncontradicted evidence, the verdicts should be set aside and judgment rendered for him in this Court, the plaintiff has failed to make it appear that it is probable that he could make a stronger case on another trial, and has presented no reason why the case should be remanded.

Other questions are raised by the exceptions in respect to the admission and exclusion of evidence and the court's charge to the jury; but, in view of the disposition we make of the case, it is not necessary to consider the same.

The defendant has brought a petition for a new trial, based upon newly discovered evidence. In view of the disposition we make of the case, it is not necessary for us to consider it, and it is dismissed, without costs.

*Judgment reversed, and judgment for the defendant to recover his costs. Petition for a new trial dismissed, without costs.*

### On Motion for Reargument and Remand.

After the foregoing opinion was handed down, the plaintiff moved for leave to reargue the case, and requests the Court, in case of reversal, to remand the same, pending which the entry -of judgment has been withheld.

Many of the reasons assigned in support of the motion are a reiteration of the claims made in the plaintiff's brief and in oral argument, and have already been fully examined by the Court. The motion does not challenge the correctness and applicability of the law of the case as stated in the opinion, and plaintiff's counsel, when arguing the motion, said the Court had stated it correctly. The burden of the plaintiff's complaint is that the Court, in treating certain evidence as conclusive, has infringed upon the province of the jury to his prejudice.

A similar question was raised on motion for a reargument in *Spaulding* v. *Mut. Life Ins. Co.*, 94 Vt. 52, 56, 109 Atl. 22, 29, and is considered fully in the opinion. It is said there that it is well-settled that the court may withdraw the case from the jury altogether, and direct a verdict for the plain-

tiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court in the exercise of a sound judicial discretion would be compelled to set aside a verdict returned in opposition to it; and that it would be an idle proceeding to submit the evidence to the jury when they could justly find only in one way. The Court further said: ''It is essential to the due administration of justice that the jury should reason correctly. It is the unquestioned right of the party to insist that this reasoning be exercised, and it becomes the duty of the court so to supervise the trial as to assure this result. Among other things, upon occasion, it is the duty to rule as to what is or is not rationally possible for the jury to do. In exercising this function the court does not decide questions of fact but is ruling on a matter of law. * * * * When the facts are such that reasonable men can fairly draw but one conclusion, the court may, and on motion should, withdraw the case from the jury.'' It is with these principles in mind that we consider the plaintiff's motion.

The plaintiff's chief criticism is to the holding that on the evidence in the case, lot 58, as marked on the ground is a small lot. This question was briefed fully by the defendant and argued by both parties, so it required our consideration. We are inclined to think that it has been given more importance by the parties than it is entitled to, as, in the view we take of the case, the size of this lot is not determinative of the main question, and is not necessarily involved as an independent fact.

The plaintiff also complains because the Court referred to the Chapin plan and the Squires plan in the opinion. These plans and the plan made by Mr. Smith for the plaintiff were not received as independent evidence, and were not considered as such by us. They were received merely to aid the jury to a proper understanding and application of the testimony of the witnesses as to the location of the physical objects involved in the controversy. *Hassam* v. *Safford Lumber Co.,* 82 Vt. 444, 448, 74 Atl. 197.

In determining whether the location of the line between lots 59 and 60 is a jury question, so that the case must be remanded, it is not necessary to consider the plans nor the size of lot 58, as marked on the ground, so we exclude the plans and the evidence relating to the size of 58, which includes the

grand lists and all evidence relating to the size of lot 47 and lot 6, third, from our consideration of this question.

 The plaintiff criticizes the conclusiveness given in the opinion to the testimony of Fred Willey and Albert Wade that the hardhack tree corner is the southwest corner of lot 60, the testimony of Henry Church that a pile of stones on a ledge marks the northeast corner of lot 26, and the testimony of James McNulty that Charles Brown pointed out the marked line between 59 and 60 to him as the dividing line between his land and Herring's land, on the ground that the credibility of these witnesses is for the jury, and the jury might disregard their testimony if they so desired. But this is not the law. Those witnesses were credible witnesses, and had no interest in the outcome of the case. Their testimony was direct and positive, and it is not contradicted by cross-examination or other testimony, facts or circumstances. The general rule is that where a credible witness testifies distinctly and positively to a fact and is not contradicted, and there is no circumstance shown from which an inference against the fact testified to can be drawn, the fact may be taken as established, and a verdict directed on such evidence. *Howard Nat. Bank* v. *Wilson,* 96 Vt. 438, 453, 120 Atl. 889; *Crichton* v. *Barrows Coal Co.,* 100 Vt. 460, 139 Atl. 252; *Potts* v. *Pardee,* 220 N. Y. 431, 116 N. E. 78, 8 A. L. R. 785. And a claim by counsel that uncontradicted testimony in a case is not true does not require a submission of the case to the jury. *Boudeman* v. *Arnold,* 200 Mich. 162, 166 N. W. 985, 8 A. L. R. 789.

The witness Willey testified that about forty-six years ago he and his brother purchased some land lying northwest of lot 60, and their lower corner at which they started to measure out their land was the hardhack tree corner; that the Brown lot cornered there. Counsel say that the witness did not remember any marks on the hardhack tree, so the jury had a right to consider his lack of memory or other weaknesses and find that the tree where he started to measure in fact had no marks on it. The testimony of the witness relative to the tree being marked is as follows: "Q. Were there any marks on it when you bought? A. I don't really remember that, it was just hewed a little on one side. Q. Blazed? A. Yes, blazed they call it." There are other perversions of the testimony in the motion, and

we call attention to this one that it may be known that they have not passed unnoticed.

The line we hold to be the true dividing line between lots 59 and 60, hereinafter referred to as the marked line, is an old marked line extending northwesterly from the Chapin stake on the southerly range line to the stake and stones at the foot of the ledge on the northerly range line. There are no marks upon the ground to indicate the location of the line claimed by the plaintiff, but, if there were such marks, that line would be approximately fifty-six rods northwesterly of the marked line.

It appears from the proprietors' records that they voted to divide the land in the town into three divisions, the first division lots to contain 104 acres each; that the committee appointed to make the survey made a report of such survey, and their survey and return were accepted; that a plan of the town was made and a field book of such survey was accepted and recorded. It appears from the town plan and the field book that all of the lots in the town, except the river lots, are 116 rods wide. The legal presumption arising from this evidence is that such a survey, as it is shown by the town plan and field book, was made; and the burden of proof is upon the party who claims that a different survey and division was made, to establish that fact. *Beach* v. *Fay,* 46 Vt. 337, 343.

The plaintiff began his case on the theory that the lines and dimensions of the lots, as shown on the town plan and described in the field book, control the location of the line in question, as his counsel said in his opening statement to the jury: "So that in getting at the location of the lot lines according to the land records (meaning the town plan and the field book as recorded in the proprietors' records) we begin at the east on the Berlin town line and count off the lots until we get up through 60, the last one beginning where the previous one ended." It was on this theory that he offered the descriptions of lots 53 to 59, inclusive, and that the court received them in evidence.

It appears from the testimony of the plaintiff's surveyor, who measured the same on the ground, that if a start is made at the Berlin town line with lot 53, and the width of that lot and each succeeding lot up to and including lot 59, is measured as it is described in the field book, plus one-thirtieth for swag

of chain, the northwesterly line of 59 is located very close to where the marked line is. It may not actually coincide with the marked line, but it is close enough to be the same line for all practical purposes.

Counsel say in the motion that it is true that there is no question as to where seven lots of 116 rods each will measure to from the Berlin line, but it is in dispute as to just what *lot* measured on the ground this distance will reach to; that there appears to be an overrun of some fifty-six rods which the Court hold material in considering the motion to set aside the verdict. The answer to this is, that so long as the plaintiff sticks to his original theory that all of the lots are each 116 rods wide, there can be no dispute as to what lot seven lots measured from the Berlin line will reach to; they will reach to the marked line between lots 59 and 60. Nor is there then any question of overrun in the lots, because there is no overrun in seven lots each 116 rods wide from the Berlin town line to the marked line. The question of overrun comes into the case only when the plaintiff attempts to establish the dividing line between lots 59 and 60 fifty-six rods northwesterly of the marked line.

In the descriptions of the lots in the field book, each corner is marked by a certain tree. The plaintiff says that the description of the lots is to and from given objects, and that he is entitled to show that lot 59 runs to such given objects or to the corner where such objects once stood even though the distances between them overrun when measured on the ground; that the same can be shown regarding lots 58 to 53, inclusive, to the Berlin town line.

The corner trees named in the field book or, if destroyed, the places on the ground where they stood were monuments, and, if they could be identified, they would control over courses and distances. No evidence was introduced on the trial below identifying any of the corner trees or their location; and the plaintiff admits that this cannot be done, as he says further in his motion: "The fact that there is a survey recorded wherein the lines are run from tree to tree (all of which were in the ground) is some evidence of a survey. The fact that the course of nature has now destroyed these trees does not make this evidence of a survey any less." The rule is that, if the existence or location of monuments is not proved, courses and distances will govern the location of lots on the ground. *Bagley*

v. *Morrill,* 46 Vt. 94. It is true that the destruction of the corner trees does not lessen the evidence of an original survey, but it does confine the plaintiff to the courses and distances given in the field book in locating the lots upon the ground, and, as we have said before, when located thus, the dividing line between lots 59 and 60 comes where the marked line is, and there is no overrun or expansion of lots.

What we have said so far has to do with the inevitable result reached when the line between lots 59 and 60 is located according to the theory upon which the plaintiff began the trial of the case.

The trouble with the plaintiff's case is that, while he still adheres to his original theory in argument, yet in locating his line between 59 and 60 he departs from it in part and follows it in part. Instead of beginning at the Berlin town line and measuring off seven lots according to their courses and distances as given in the field book, he starts at the northwesterly line of lot 57, the actual location of which as marked upon the ground, is at least forty-six rods farther to the northwest than its location as shown by the town plan and field book, and then measures off two full lots according to the courses and distances of the field book, in utter disregard of corners and lines marked upon the ground, and calls the point reached by said measurement the location of the dividing line, although there is nothing marked upon the ground to indicate the location of a line at that place. It is only when the plaintiff does this that the overrun or expansion of lots comes into the case. But, as we say in the opinion, the line cannot be established in this way, and, in the absence of evidence of the location upon the ground of the lot lines as originally surveyed, the marked line must control.

The plaintiff says that the Court gives too conclusive a character in the opinion to the question of adverse possession. This question is treated fully in the opinion, and we have nothing to add to what is said there.

All that has been presented to us in support of the motion for reargument has been carefully considered, and no ground for the motion is found.

We rendered judgment for the defendant because on the undisputed evidence the court below should have rendered such a judgment, and we were unable to see how the plaintiff could

make a better case on another trial. On the motion for a remand the plaintiff has not satisfied us that it is probable that he will be able to make a stronger case on another trial than he made on the trial below. He has not brought to our attention any new and additional evidence that might strengthen his case. His principal ground for a remand is that he may have further opportunity to do more surveying northwesterly 'from lot 59 to the Duxbury town line in the hope that he may discover something that will aid him. But this is not a ground for a remand. Counsel when arguing the motion stated that he did not expect to find anything that would substantially change the location of the line claimed by the plaintiff.

We have already held that his present line cannot be maintained, and nothing has been presented that makes it appear probable that another line near it could be maintained. We are not dealing now with lines on maps or plans, but with lines marked on the ground. The marked line on the ground dividing lots 59 and 60 and the distance between it and the Berlin town line cannot be affected or changed by any surveying done northwesterly of it.

*The motion for reargument and remand is denied.*